724 P.2d 232

**LaVerne McCAULEY, Plaintiff-Appellee
and Cross-Appellant,**

**v.**

**TOM McCAULEY & SON, INC., et al.,
Defendants-Appellants and
Cross-Appellees.**

**No. 7861.**

Court of Appeals of New Mexico.

July 8, 1986.

Bryan L. Query, Bryan L. Query, P.A., Albuquerque, Daniel A. Dolan, Daniel A. Dolan, P.A., Las Cruces, for plaintiff-appellee and cross-appellant.

John W. Reynolds, Silver City, R. Wilson Martin, Beverly J. Singleman, Martin, Cresswell, Hubert & Hernandez, P.A., Las Cruces, for defendants-appellants and cross-appellees.

## OPINION

GARCIA, Judge.

LaVerne and Fred McCauley were married to one another and owned 60% of the stock in Tom McCauley & Son, Inc. (corporation), a closely held family corporation involved in cattle ranching. They separated in 1977 and were subsequently divorced. Thereafter, LaVerne McCauley (plaintiff), brought an action against the corporation and the remaining shareholders which included her former husband, parental inlaws and two sons (defendants). Her lawsuit sought damages for fraud and breach of fiduciary duty; she also sought to compel an involuntary liquidation pursuant to NMSA 1978, Section 53–16–16 (Repl.Pamp. 1983), on the basis that the majority stockholders had engaged in oppressive conduct.

After an eight-day nonjury trial, the court found in favor of plaintiff on her allegation of oppressive conduct, but denied all other claims raised in her complaint. The court also found for the corporation on its debt counterclaim. The court granted defendants three options: (1) liquidation of the corporation; (2) partition and reorganization; or (3) purchase by the corporation of plaintiff's outstanding shares. Defendants chose the third option.

Defendants filed a timely appeal and raise three issues: (1) whether there is

substantial evidence to support the trial court's finding of oppressive conduct under Section 53–16–16; (2) whether the trial court erred in determining the fair market value of the corporate stock based on an appraisal of corporate assets rather than on the fair market value of a minority interest in the stock of a close family corporation; (3) whether the court erred in awarding plaintiff an interest in oil, gas and mineral rights after directing that plaintiff's stock be purchased by the corporation.

By cross-appeal, two additional issues are presented: (1) whether the court erred in discounting the value of the corporate stock, and (2) whether the corporation was estopped from challenging the value of its share of a water rights sale. A preliminary issue concerning the propriety of plaintiff's cross-appeal is also before this court.

## MOTION TO RECONSIDER CROSS–APPEAL

█ Judgment was entered on May 3, 1984. Defendants filed a timely notice of appeal. Thirty days after entry of the judgment, pursuant to NMSA 1978, Civ. App. Rule 3(a)(1) (Repl.Pamp.1984) would have been Saturday, June 2nd. Inasmuch as the thirtieth day fell on a Saturday, the time for filing an appeal would be extended until the end of the next day which is not a Saturday, Sunday or a legal holiday. NMSA 1978, Civ.App.R. 23(a) (Repl.Pamp. 1984). Thus, plaintiff's cross-appeal should have been filed by Monday, June 4, 1984. Plaintiff filed her cross-appeal on June 6, 1984. Defendants filed a motion with this court to dismiss plaintiff's cross-appeal as being untimely, but prior to the time that this court acted on defendants' motion, plaintiff also filed a motion with the district court, pursuant to Civ.App. Rule 3(f). This motion was filed more than thirty days from entry of judgment, but before expiration of sixty days. With minimal notice to defendants, the court heard plaintiff's request for an extension and defendants' arguments in opposition. After hearing the arguments, the court granted plaintiff's extension to June 6th, the date on which the cross-appeal had been filed. On June 25, 1984, the court of appeals, without being advised that a motion to extend the time for filing had either been presented to the district court or acted upon, granted defendants' motion to dismiss plaintiff's cross-appeal. When this court was subsequently apprised that the trial court had extended the time for filing the notice, the appeal was reinstated on this court's docket. Defendants have requested that this court reconsider the decision to reinstate the appeal. In light of the vast discretion accorded the trial court by Civ.App. Rule 3(f), we decline to reconsider our decision in this matter. *See White v. Singleton*, 88 N.M. 262, 539 P.2d 1024 (Ct.App.1975).

## BACKGROUND

In 1947, Tom McCauley and his wife Marie, together with their two sons, Fred and Tom, formed a partnership and maintained a cow-calf ranching operation in Grant County. In 1950, Fred McCauley married LaVerne and they both devoted their efforts and talents to the operation of the ranch.

To take advantage of favorable tax treatment and to provide for protection of assets, the partners established a family corporation in 1969. The business was incorporated as Tom McCauley and Son, Inc. As a result of the original stock issue and subsequent acquisitions and transfers, Tom and Marie McCauley owned a combined total of 33% of the outstanding shares. Fred McCauley and LaVerne McCauley each owned 30.21% of the corporation's outstanding stock and the remaining stock was owned by Fred and LaVerne's sons. Fred and LaVerne, together with the other shareholders, continued to devote all their work energy to the corporation. Plaintiff was a director and officer of the corporation, kept the corporate books and managed the corporate accounts. Additionally, plaintiff performed all household chores for her family and also provided some cooking and cleaning for various ranch hands. Fred McCauley managed the

ranch and took care of the day-to-day operations.

Because a corporate resolution required the around-the-clock presence of corporate employees at the ranch, the corporation was authorized to provide its shareholders with food, housing, utilities, vehicles and gasoline, medical insurance and other benefits.

In 1977, Fred and LaVerne began to experience severe marital difficulties. Their domestic strife had a significant adverse impact on their ability to get along with one another, and plaintiff left the ranch home in 1978. She ultimately petitioned for a dissolution of marriage. The divorce proceedings were bitter and acrimonious, and the protracted litigation generated much ill-will and resentment between Fred, LaVerne, her in-laws and children.

Following her departure from the ranch, plaintiff was not re-elected to her position as an officer and director of the corporation and no longer received the corporate benefits enjoyed by the remaining shareholders. During discovery proceedings in the domestic litigation, Fred learned that over the years, plaintiff had withdrawn large amounts of partnership and corporate funds and had utilized them for her own benefit. This information was conveyed by Fred to the remaining shareholders prior to the re-election of officers, and this information, together with the bitterness existing amongst the shareholders, resulted in plaintiff not being re-elected to the board.

Because of her difficult financial situation following the separation, plaintiff made numerous demands on the corporation for a declaration of dividends. The majority shareholders, however, determined that the corporation's debt should be substantially reduced before dividends would be declared, and accordingly, no dividend was paid to plaintiff. There was no dispute that funds were available and could have been used to pay dividends. Similarly, plaintiff sought to return to the ranch and reside in one of the available houses. Her request was denied. The problems between the parties continued and ultimately culminated in plaintiff bringing this action against the corporation and the majority shareholders asserting that the majority engaged in fraudulent, oppressive and illegal activities, including corporate mismanagement.

Plaintiff contended that she had been ousted from her position on the board and had been effectively denied a voice in the management and decision-making processes of the corporation. She contended that corporate assets had been wrongfully converted to the personal use of Fred McCauley and that she was being denied corporate benefits of lodging, food, transportation and other economic advantages. Plaintiff asserted, among other things, that the corporation's refusal to declare a dividend, when coupled with the corporate restrictions on stock transfers, resulted in oppressive conduct. The corporation counterclaimed for the money withdrawn by plaintiff.

The court determined that the directors and majority stockholders had acted with the intent to "freeze out" plaintiff from the corporation, and that defendants' conduct was oppressive. The court also found for the corporation on its counterclaim. The court proposed three alternative remedies, and defendants opted to purchase plaintiff's shares. Both parties have appealed.

## WHETHER THERE IS SUBSTANTIAL EVIDENCE ON OPPRESSIVE CONDUCT

Section 53–16–16 was derived from Section 97 of the ABA Model Business Corporation Act. It provides a procedure whereby the district court may order the involuntary dissolution of a corporation. In relevant part, Section 53–16–16(A)(1)(b) provides:

A. The district courts may liquidate the assets and business of a corporation:

(1) in an action by a shareholder when it is established that:

* * * *

(b) the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent. . . .

We initially approve the trial court's recognition of remedies not specifically stated in the oppressive conduct statute. *See Baker v. Commercial Body Builders, Inc.*, 264 Or. 614, 507 P.2d 387 (1973); *see generally Prager v. Prager*, 80 N.M. 773, 461 P.2d 906 (1969). An order of corporate dissolution is a drastic remedy and should be utilized sparingly, after consideration of other alternative forms of relief. *Barnett v. International Tennis Corp.*, 80 Mich. App. 396, 263 N.W.2d 908 (1978); *Browning v. C & C Plywood Corp.*, 248 Or. 574, 434 P.2d 339 (1967).

The trial court made findings of fact, and concluded that the directors or those in control of the corporation engaged in oppressive conduct. Our task is to determine whether the trial court's findings and conclusions are supported by substantial evidence.

New Mexico adheres to the firmly rooted principle that the appellate court will not substitute its judgment for that of the trial court in weighing the evidence. If the trial court's findings are supported by substantial evidence, then it is of no consequence that we might have chosen to give greater or lesser credit to the testimony of particular witnesses. Nor is it significant that there is evidence that supports defendants' view of the case. The trial judge heard the testimony, examined the exhibits, observed the demeanor of witnesses and made decisions on the credibility of those who have appeared before the court. We will not substitute our judgment for the trial court, but rather, will review the record to determine whether the evidence supports the court's findings, and apply the substantial evidence test. *Southern Union Exploration Co. v. Wynn Exploration Co.*, 95 N.M. 594, 624 P.2d 536 (Ct.App. 1981).

**Oppressive Acts**

In close family corporations, a shareholder dissatisfied with corporate policy and practice is not able to sell his shares with the same ease as a shareholder in a public corporation. Restrictions on stock sales, transfers or encumbrances are generally the rule in closely held corporations. Limited markets exist for stock in these corporations and potential investors are naturally reluctant to purchase a non-controlling interest in a closely held corporation which has been marked by dissension and dissatisfaction. This lack of ready access to the market place can result in minority shareholders being held hostage by the controlling interest, and can easily lead to situations where the majority "freeze out" or "squeeze out" minority shareholders by use of oppressive tactics. *See generally*, 2 F. O'Neal, *Close Corporations*, § 9.02 (2d ed.1971); O'Neal, *Close Corporations: Existing Legislation and Recommended Reform*, 33 Bus.Law. 873 (1978); Comment, *Oppression as a Statutory Ground for Corporate Dissolution*, 1965 Duke L.J. 128.

Due in large measure to these practices, many states, including New Mexico, have adopted Section 97 of the ABA Model Business Corporation Act. Section 97, codified as Section 53-16-16, provides courts with statutory authority to order corporate liquidation when a shareholder can demonstrate fraudulent, illegal or oppressive acts by the directors or those in control of the corporation.

Oppressive conduct is not defined in New Mexico's statute nor in the Model Act. Rather, it is an expansive term that is used to cover a multitude of situations dealing with improper conduct. One commentator notes that a narrow definition of oppressive acts or conduct would be inappropriate. Comment, 1965 Duke L.J. 128, *supra*. The absence of a rigidly defined standard for determining what constitutes oppressive behavior enables courts to determine, on a case-by-case basis, whether the acts complained of serve to frustrate the legitimate expectations of minority shareholders, or whether the acts are of such severity as to warrant the requested relief.

While there can be no specific catalogue of elements necessary to a finding of oppression, numerous courts and commentators have attempted to provide guidance on

the parameters of oppressive conduct in the context of the closely held corporation. *See, e.g., Jackson v. St. Regis Apartments, Inc.,* 565 S.W.2d 178, 183 (Mo.App.1978) ("the term oppression suggests harsh, dishonest or wrongful conduct and a visible departure from the standards of fairdealing which inure[s] to the benefit of [the] majority and to the detriment of the minority.")

Many courts, noting the hybrid nature of closely held corporations, with their similarities to both traditional corporations and partnerships, have examined the role played by the shareholders' original agreement in defining oppressive conduct.

> Unlike their counterparts in large corporations, minority shareholders in small corporations often expect to participate in management and operations. "Furthermore, there generally is an expectation on the part of some participants that their interest is to be recognized in the form of a salary derived from employment with the corporation," [citations omitted]. These reasonable expectations constitute the bargain of the parties in light of which subsequent conduct must be appraised.

*In re Application of Topper,* 107 Misc.2d 25, 433 N.Y.S.2d 359, 365 (1980).

In *Topper,* a New York court granted an application for corporate dissolution on the grounds of oppression. In that case, two controlling shareholders discharged the minority shareholder as an employee and officer of the two corporations in which he had an interest. The court distinguished oppressive conduct from illegal or fraudulent behavior as have numerous other jurisdictions.

In *Gidwitz v. Lanzit Corrugated Box Co.,* 20 Ill.2d 208, 170 N.E.2d 131 (1960) and *White v. Perkins,* 213 Va. 129, 189 S.E.2d 315 (1972), the courts found oppressive conduct where the majority shareholders had engaged in a series of otherwise legal acts, which effectively prevented the non-controlling shareholder from participating in the operation and management of the corporation. The *White* court distinguished oppressive conduct:

> The word "oppressive," as used in the statute * * * can contemplate a continuing course of conduct. The word does not necessarily savor of fraud, and the absence of "mismanagement, or misapplication of assets," does not prevent a finding that the conduct of the dominant directors or officers has been oppressive. It is not synonymous with "illegal" and "fraudulent."

189 S.E.2d at 319.

Similarly, in *Compton v. Paul K. Harding Realty Co.,* 6 Ill.App.3d 488, 285 N.E.2d 574 (1972), the appellate court rejected defendant's claim that because the lower court found that defendant had committed no fraud, the trial court had no basis for its order of dissolution. The Illinois Appeals Court pointed to evidence that defendant had refused to call meetings of the board of directors, to consult with plaintiff regarding management of corporate affairs, to his dilatory reaction to plaintiff's requests and to his "imperious attitude." The court concluded that the record showed an "arbitrary, overbearing and heavy-handed course of conduct" sufficient to show oppression. *Id.* 285 N.E.2d at 581.

Caution must be exercised in determining what circumstances support a showing of oppressive conduct. Mere dissatisfaction on the part of a minority stockholder will not justify dissolution. In *Meiselman v. Meiselman,* 309 N.C. 279, 307 S.E.2d 551 (1983), in a concurring opinion Justice Martin emphasized the importance of considering all the facts before concluding that plaintiff's "reasonable expectations" had been thwarted. Justice Martin stressed that the duty of good faith and fair dealing owed by the majority to the minority should not be a shield for plaintiff's own inequitable conduct, nor should the corporation be necessarily held to account for oppressive behavior "merely because plaintiff's expectations were not fulfilled." *Id.* 307 S.E.2d at 573. *See also Exadaktilos v.*

*Cinnaminson Realty Co.,* 167 N.J.Super. 141, 400 A.2d 554 (1979).

In closely held corporations involving family members, courts have normally given considerable weight to the hostility existing between family members and its effect upon the minority shareholder's ability to have an effective voice in the running of the corporation. *See Stumpf v. C.E. Stumpf & Sons, Inc.,* 47 Cal.App.3d 230, 120 Cal.Rptr. 671 (1975); *Meiselman v. Meiselman.*

New Mexico courts have not, thus far, been called upon to define oppressive conduct. There are, however, cases interpreting Section 53–16–16 which have considered whether certain conduct was or was not oppressive.

In *Schwartzman v. Schwartzman Packing Co.,* 99 N.M. 436, 659 P.2d 888 (1983), plaintiffs alleged that there was mismanagement and oppressive conduct by the majority. Without discussing what would constitute oppressive conduct, the supreme court determined that the trial court's conclusion that defendants' conduct was not oppressive was supported by substantial evidence.

■ *Schwartzman* is useful insofar as it reviews plaintiffs' allegations in the context of whether various actions amounted to or supported a finding of oppressive conduct. The supreme court agreed with the trial court that the evidence established: that there was no mismanagement of corporate affairs amounting to oppressive behavior; that corporate assets were not misapplied or wasted; that plaintiffs had full access to the books and records; that they were not maintained in an inaccurate or inequitable manner; and that all shareholders had used corporate assets for personal purposes. Further, the supreme court upheld the trial court's findings that the expectations of the minority shareholders had not been jeopardized, and that plaintiffs' contention that irreconcilable hostility existed among the shareholders, sufficient to support dissolution, was not supported by substantial evidence. Essentially the supreme court's review of the

trial court's findings and conclusions indicates that when the enunciated conduct does occur, a court may determine that the conduct is oppressive within the meaning of Section 53–16–16.

In *DiIaconi v. New Cal Corp.,* 97 N.M. 782, 643 P.2d 1234 (Ct.App.1982), plaintiffs minority shareholders brought a suit pursuant to Section 53–16–16. Plaintiffs alleged various acts of misconduct on the part of the majority involving business decisions made by the majority. The trial court, invoking the business judgment rule, declined to find that the majority's acts had been "illegal, oppressive or fraudulent." This court agreed, noting that Section 53–16–16 "does not provide that disagreement warrants liquidation." *Id.* at 788, 643 P.2d at 1240. This court further stated that "conduct that does not produce an injury, even though objectionable to the protestants, does not call for judicial interference." *Id.*

■ With this background on what constitutes oppressive conduct, we turn to the court's findings. The court found:

"10. Based on her contributions to the corporation and the understanding between herself and the other shareholders at the time of the formation of the corporation, LaVerne reasonably expected to participate in the day-to-day management and decision-making processes of the corporation, as well as to share in the income and advantages provided by the corporation.

"11. Between the dates of the formation of the corporation and approximately 1977, LaVerne provided valuable labor and services for the corporation, served as the Secretary-Treasurer of the corporation, and actively participated in the day-to-day activities, management and decision-making processes of the defendant corporation.

"12. For the approximately seven years following the organization of the corporation, 1970–1977, LaVerne received benefits from the corporation which included, but were not limited to, the following:

(a) adequate food and lodging for herself and her children;

(b) transportation, gas, oil and other expenses related thereto;

(c) clothing;

(d) personal maintenance expenses; and

(e) increases in the value of her ownership interest in the corporation.

"13. LaVerne's reasonable expectations with respect to her participation in the management of the corporation, and with respect to sharing in the assets and profits of the corporation were met and reconfirmed between 1970 and 1977.

"14. In approximately 1977, LaVerne and Fred began experiencing severe marital difficulties which eventually resulted in a dissolution of the marriage between them in 1980.

"15. Since the commencement of marital difficulties between LaVerne and Fred, LaVerne has been deprived of virtually all benefits which had previously been received by her from the corporation.

"16. The divorce action between LaVerne and Fred was disputed and emotionally charged, involved allegations of misconduct on the part of each of the parties thereto, and divided the loyalties of the shareholders of the corporation.

"17. During the pendency of the divorce action between LaVerne and Fred, an extreme cooling of the relationship between LaVerne and the other directors and shareholders of the corporation resulted and continued through the date of trial of this matter.

"18. In 1978, during the divorce proceedings, Fred stated to LaVerne that she " * * * would never get a damned dime from the corporation."

"19. In 1978, during the pendency of the divorce, Fred reviewed some of the corporation records and, despite having no training in bookkeeping or accounting and without consulting anyone trained in bookkeeping or accounting, concluded that LaVerne had stolen, embezzled or otherwise wrongfully appropriated monies of the corporation and utilized them for her personal benefit.

" * * * * *

"23. Immediately before the shareholders meeting held in April of 1979, Fred accused LaVerne of dishonesty by telling other shareholders that LaVerne had stolen, embezzled or otherwise wrongfully appropriated corporate monies to her personal use.

" * * * *

"25. No shareholder of the corporation ever informed LaVerne of the accusations of dishonesty which had been made against her, nor sought an explanation from LaVerne regarding the matter of her alleged theft from the corporation.

" * * * *

"28. The accusations of Fred that LaVerne had acted dishonestly by stealing, embezzling or wrongfully appropriating corporate monies to her own use were untrue and unfounded.

"29. The representation of Fred that LaVerne had acted dishonestly by stealing, embezzling or otherwise appropriating corporate monies to her own use was believed by the shareholders to whom said representations were communicated.

"30. At the annual meeting of the corporation's shareholders in April of 1979, Fred moved to elect a board of directors which excluded LaVerne from membership on said board.

"31. Based on the representations of Fred that LaVerne had stolen, embezzled or otherwise wrongfully appropriated corporate monies to her use, the majority of the shareholders voted to oust LaVerne from membership on the Board of Directors of the corporation at the annual meeting of the shareholders held in April of 1979.

"32. LaVerne was also removed from her office as Secretary-Treasurer of the corporation at the annual shareholders meeting in 1979.

" * * * *

"36. Since 1977, Fred was acknowledged by all defendant shareholders as the person in control of the corporation.

"37. From the inception of the marital difficulties between LaVerne and Fred in 1977, until the date of trial, the only benefits which LaVerne received from the corporation were:

(a) a declared but unpaid dividend of SIX HUNDRED DOLLARS ($600) in 1979; and

(b) "gifts" of a few sides of beef.

"38. In 1979, Fred received a dividend from the corporation in the amount of SIX THOUSAND DOLLARS ($6,000), which was ten (10) times greater than the amount declared but not paid to LaVerne, who held the same number of shares.

"39. The dividend paid to Fred was used to pay his personal legal fees arising from his divorce from LaVerne.

"40. Fred, at all times following the commencement of marital difficulties between himself and LaVerne, remained on the corporate premises, utilized the lodging, food, transportation and other economic advantages available through the corporation, whereas LaVerne was forced to leave the ranch, exhaust her inheritance and borrow monies at exceptionally high rates of interest in order to eke out a living.

"41. The defendants, at all times since the marital difficulties which arose between LaVerne and Fred, were aware that LaVerne's economic situation was severely and adversely affected by her inability to derive any economic benefit from her interest in the corporation, yet refused to declare and pay LaVerne any dividends.

" * * * *

"45. The corporation did not hold annual Board of Directors meetings in 1978, 1981, 1982 or 1983, nor stockholders meetings in 1978 or 1983.

"46. Since her ouster in 1979, LaVerne has been effectively denied a voice in the management and decision-making process of the corporation in that she has been excluded from meaningful participation in the affairs of the corporation and denied any part in its operation, either as a director or as a minority stockholder, except for participation in the annual stockholders meetings.

"47. The defendants, by ousting LaVerne from the Board of Directors and her office in the corporation and by refusing to declare and pay dividends, used their corporate control and position in a manner calculated to eliminate LaVerne from the corporation or to reduce to insignificance her claims on the corporate earnings, assets or advantages to which she was entitled.

"48. Since 1978, Fred has operated the corporation as he has seen fit, and has carried on the ranch operations at times and in manners that he determined, including the buying and selling of livestock, and equipment, the hiring and firing of employees (including members of his family and of his new wife's family), determining the wages to be paid to employees, determining who had the right to the use of corporate equipment and supplies (including gas and oil), deciding which obligations owing to the corporation would be collected or not, and determining what records would be kept with regard to said receivables.

"49. The books and records of the corporation have been maintained in an inaccurate and inequitable manner.

"50. Deep seated animosities and distrust arose between LaVerne and the majority shareholders, officers and directors of the corporation, continued through the date of trial, are not capable of resolution and thereby present an irreconcilable barrier to the ability of the corporation to function properly.

"51. LaVerne's reasonable expectations that she would be able to participate in the management of the corporation and share in the assets and profits of the corporation have been thwarted since 1978 by the acts of the directors and those in control of the corporation."

The foregoing findings touch on virtually all of the issues which may properly be considered by a court in determining whether the acts of the majority have constituted oppressive conduct. *See* 19 Am. Jur.2d *Corporations* § 2767 (1986). A rec-

itation of the evidence that supports these findings would be unduly lengthy, and serve no useful purpose. We have carefully examined the record and find evidence to support the court's factual findings in this case.

In sum, we conclude that there is substantial evidence in support of the court's findings, and determine that the court's findings support the conclusion that defendants engaged in oppressive conduct.

## WHETHER THE COURT ERRED IN DETERMINING THE FAIR MARKET VALUE OF PLAINTIFF'S STOCK BASED ON AN APPRAISAL OF THE CORPORATION'S UNDERLYING ASSETS

Defendants argue that the court erred in establishing the fair market value of plaintiff's stock based on the testimony of Mr. Jay Coyle, plaintiff's expert ranch appraiser. Defendants contend that plaintiff's expert testified as to the value of the corporation's assets, not its stock.

Because the corporation's stock was not publicly traded, and does not have a history of arm's length transactions, defendants argue that the determination of fair value should have considered a variety of other factors including: the nature and history of the corporation; the book value of the stock; the earnings capacity of the corporation; the corporation's dividend-paying capacity; and the size of the block of stock being valued. *See Hamm v. Commissioner of Internal Revenue*, 325 F.2d 934 (8th Cir.1963); *Estate of Newcomer v. United States*, 447 F.Supp. 1368 (W.D.Pa.1978).

▪ Defendants are correct in stating that the foregoing are appropriate factors to consider in establishing the fair value of corporate stock. In *Tome Land & Improvement Co. v. Silva*, 83 N.M. 549, 494 P.2d 962 (1972), a case under the dissenting shareholder's statute, now codified as NMSA 1978, Section 53-15-4 (Repl.Pamp. 1983), the supreme court discussed various criteria which could be considered in appraising the fair value of stock. The *Tome* court noted that three factors had traditionally been considered: (1) net asset value; (2) market value; and (3) investment or earnings value. In *Tome*, the supreme court pointed out that the trial courts have vast discretion in this area, and may weigh these factors in whatever proportion the court believes is appropriate to reflect their importance and reliability in a particular case.

▪ When weighing the enumerated factors, *Tome* directs that a court consider the nature of the corporation, market demand for its stock, the business the corporation is engaged in, its earnings, net assets and other variables. *Accord Couzens v. Commissioner of Internal Revenue*, 11 B.T.A. 1040 (1928).

Depending upon the circumstances in a given case, a court may decide to give no weight at all to a particular factor, as long as that decision is supported by a consideration of the variables outlined by the court. *Tome Land & Improvement Co.* The considerable discretion accorded the trial court in the valuation of intangibles has been recognized in other settings. *See generally Hertz v. Hertz*, 99 N.M. 320, 657 P.2d 1169 (1983).

Defendants agree that the elements of valuation stated in *Tome* provide an appropriate method to determine the worth of plaintiff's shares in this case. Defendants further agree that *Tome* grants the trial court great discretion in deciding the weight to be given the three factors. Moreover, there is no assertion of a lack of substantial evidence to support the court's valuation. Rather, it is the trial court's alleged refusal to consider anything except the net asset value provided by plaintiff's expert Mr. Coyle, that defendants complain of in this appeal.

▪ Plaintiff maintains that "the only appropriate measure" for valuing an oppressed shareholder's stock is net asset value. Alternatively, plaintiff argues that the trial court did consider all of the *Tome* variables. We disagree with both parties to the extent that they assert that net asset value was the only factor that could be or was considered by the court. *See* Schreier & Joy, *Judicial Valuation of "Close" Cor-*

*poration Stock: Alice in Wonderland Revisited,* 31 Okla.L.Rev. 853 (1978). The record is replete with evidence of the *Tome* elements, and the valuation considerations of *Hamm v. Commissioner of Internal Revenue.*

Evidence was presented on the history of the corporation, its capitalization, operation and financial health. Its assets and liabilities were before the court, as was information concerning the economics of a ranching operation. The court knew the book value of the stock, the corporation's debt and dividend history and its corporation's earning capacity. *Cf.* Rev.Rul. 59–60, § 402, 1959–1 C.B. 237 (eight fundamental factors having probative significance in the valuation of stock in closely held corporations are: (1) nature and history of the business; (2) economic outlook; (3) book value and financial condition; (4) earning capacity; (5) dividend paying capacity; (6) goodwill and similar intangibles; (7) size of block of stock and restrictions thereon; and (8) market prices of comparable listed stocks).

The court heard testimony from most of the corporate principals and employees, and was aware of the corporation's management practices. Evidence was presented on the corporation's recent troubled history which related to plaintiff's claims of oppressive conduct. The trial court was also aware of the limited market for the purchase of plaintiff's non-controlling interest.

Since evidence was presented to the court on the relevant valuation factors, we disagree with the contention that the court failed to correctly determine a fair value for plaintiff's shares. The trial court's decision in this matter is affirmed.

## WHETHER THE COURT ERRED IN AWARDING PLAINTIFF AN UNDIVIDED INTEREST IN THE CORPORATION'S OIL, GAS AND MINERAL RIGHTS AFTER THE SALE OF HER STOCK TO DEFENDANTS

During the course of the trial, plaintiff did not present any evidence concerning either the existence or value of any oil, gas or minerals on the McCauley properties.

The only mention of oil, gas or minerals came during the testimony of Mr. Coyle, who testified as to the value of the McCauley ranch. Mr. Coyle stated that his appraisal did not separately value improvements or minerals. Nevertheless, plaintiff submitted a proposed finding, which was accepted by the court, which reserved in plaintiff an undivided interest in oil, gas or mineral rights in proportion to her stock ownership. Thus, pursuant to the court's finding and judgment, even when the corporation purchases plaintiff's shares, plaintiff would still retain a 30.21% ownership in any oil, gas or mineral rights owned by the corporation. Defendants contend the court erred in granting plaintiff any interest in the corporation's underlying assets. We agree.

The valuation approach utilized by plaintiff's expert did not consider the presence or value of minerals. Had plaintiff utilized some alternate valuation approach which separately valued minerals, it might have been appropriate for the court to enter findings on their worth. In the absence of evidence, however, it was inappropriate for the court to find that oil, gas or minerals existed on the property.

Additionally, the court's award of an interest in the corporation's assets is not conceptually sound. Once defendants purchased plaintiff's stock in the corporation, plaintiff would have no further interest in the corporation's assets. A share of stock represents a proportionate ownership interest in the corporation, but does not vest the stockholder with any right or title to any of the corporation's underlying assets. *Cruising World, Inc. v. Westermeyer,* 351 So.2d 371 (Fla.App.1977). *See Torrey Delivery, Inc. v. Chautauqua Truck Sales & Service, Inc.,* 47 A.D.2d 279, 366 N.Y.S.2d 506 (1975). A corporation is an entity entirely separate from its shareholders. *Boothe Financial Corp. v. Loretto Block, Inc.,* 97 N.M. 496, 641 P.2d 527 (Ct.App. 1982). Ownership of capital stock is not identical with or equivalent to ownership of corporate property. *Damico v. State,* 153 Fla. 850, 16 So.2d 43 (1943).

This principle was aptly stated in *Miller v. McColgan*, 17 Cal.2d 432, 110 P.2d 419, 421 (1941):

It is fundamental, of course, that the corporation has a personality distinct from that of its shareholders, and that the latter neither own the corporate property nor the corporate earnings. The shareholder simply has an expectancy in each, and he becomes the owner of a portion of each only when the corporation is liquidated by action of the directors or when a portion of the corporation's earnings is segregated and set aside for dividend payments on action of the directors in declaring a dividend.

The corporation owns the real estate together with any mineral rights which may be appurtenant to the property. *See generally, Sachs v. Board of Trustees of Cebolleta Land Grant*, 89 N.M. 712, 557 P.2d 209 (1976). Plaintiff's interest in the corporation is solely represented by her ownership of 30.21% of the corporation's outstanding shares. Once defendants purchase plaintiff's shares of stock, plaintiff no longer possesses any interest in the corporation's assets. Any mineral rights which may be on the property belong to the corporation, not to plaintiff.

We conclude that the court erred in reserving a 30.21% undivided interest in oil, gas or mineral rights in plaintiff. That portion of the court's judgment is set aside.

**WHETHER THE COURT ERRED IN DISCOUNTING THE VALUE OF PLAINTIFF'S SHARES BY TWENTY-FIVE PERCENT**

Plaintiff argues that the court erred in discounting the value of her shares because they were minority shares in a close family corporation. Plaintiff contends that the remedy under the oppressed shareholders statute, Section 53–16–16, is liquidation. Had the court ordered corporate liquidation, plaintiff would have received her proportionate share of the corporation's net assets. Plaintiff argues that by giving defendants the option of purchasing plaintiff's share at a discount, defendants have

been allowed to benefit from their own wrongful conduct.

We reject plaintiff's argument. Throughout the proceedings, plaintiff argued that upon a finding of oppressive conduct, the court was not bound to simply order corporate dissolution and liquidation, but rather, could choose from a variety of alternative remedies; including utilization of its "reservoir of equitable powers."

When defendants objected to testimony concerning remedies other than corporate dissolution, plaintiff, through counsel, responded:

Mr. Reynolds is correct that the statute talks solely in terms of dissolution. But we intend to offer to the court, based, first of all, on the case of *Prager v. Prager*, [80 N.M. 773, 461 P.2d 906 (1969)], and as we have argued in our opening statement, we think the court has other powers, which it might exercise, giving it authority to [do] what it thinks is correct, short of dissolution.

Plaintiff's counsel correctly noted that in jurisdictions having oppressive conduct statutes similar to New Mexico, courts have utilized other remedies to avoid the harshness of dissolution provided for by statute. *See Baker v. Commercial Body Builders, Inc.*

The court accepted plaintiff's argument. In reliance on *Baker* and *Prager*, the court authorized remedies other than the one specifically listed in the oppressive conduct statute. Those remedies included liquidation, reorganization, which would result in the partition of the corporation, or purchase of plaintiff's shares. Defendants opted to purchase plaintiff's interest in the corporation.

In determining a "fair and reasonable" price for that interest, the court took into account a variety of factors. It considered the value of corporate property based on a market data approach. Secondly, the court established a value for the corporation's livestock. It determined the value of the machinery and equipment, less depreciation. The court also included re-

ceivables and monies due the corporation. From the total asset figure, the court deducted outstanding obligations, including notes and loans due stockholders, and established a net value of the corporation at $3,257,800. Based on plaintiff's 30.21% interest in the corporation, plaintiff's share of the corporation's net assets was established at $984,180. This value was discounted by 25% because plaintiff's interest was that of a minority shareholder in a close family corporation. Plaintiff argues that the court erred in allowing a discount.

We believe the court properly exercised its discretion in ascertaining an appropriate discount factor for non-controlling shares. A trial court has great discretion in weighing factors that determine the value of a corporation's stock. *See Tome Land & Improvement Co. v. Silva.*

Discount factors have often been utilized by courts to reflect the decreased value of shares in close corporations as opposed to publicly traded shares. *See Central Trust Co. v. United States,* 158 Ct.Cl. 504, 305 F.2d 393 (1962); *Estate of Newcomer v. United States,* (34% discount); *Obermer v. United States,* 238 F.Supp. 29 (D.Haw. 1964) (33 & ⅓% discount); *Whittemore v. Fitzpatrick,* 127 F.Supp. 710 (D.Conn.1954) (50% discount).

Moreover, when the shares sought to be sold are non-controlling shares, there is a limited market which depresses the value of the stock. Discount factors have been applied to non-controlling shares. *Righter v. United States,* 194 Ct.Cl. 400, 439 F.2d 1204 (1971) (30% discount); *Drybrough v. United States,* 208 F.Supp. 279 (W.D.Ky. 1962) (35% discount); *Whittemore v. Fitzpatrick,* (16% additional discount for minority shares); *see* Schreier & Joy, *supra.*

In this case, a certified public accountant, qualified as an expert, was asked:

Q. What is the result of your research as to how minority stockholder's stock are valued for inheritance tax purposes?

A. They are substantially discounted from the proportionate share of the assets to which they're attached.

Q. What percentages are discounted?

A. I'm quoting from an IRS evaluation guideline that cites three cases. The discounts in these three cases were 26 percent, 22 percent and 32 percent.

On cross-examination, the witness was asked:

Q. [W]hat is the correlation between discount for inheritance tax purposes and any discount for fair market value?

A. It would be precisely the same thing because the estate tax is based on fair market value.

Thus, there was evidence in the record from which the court could apply a range of discount factors to a minority stockholder's shares to determine their true market value. Plaintiff recognizes the diminished value of non-controlling stock. Plaintiff's counsel argued to the trial court:

If I may return, just a moment, to the difficulties of a minority stockholder * * * Often under the circumstances, which is—which pertain to this case, one cannot find a buyer. It's difficult to find one that will take the minority shareholder's position, and certainly, as the evidence has indicated in this case, [it] often happens, the stock then becomes virtually worthless.

Plaintiff's observation concerning the depressed value of a minority shareholder's stock is in accord with the views of experts in the field. *See* O'Neal, *Close Corporations, supra.*

The court heard and considered evidence on acceptable discount factors to be applied for minority shares. Evidence was presented concerning potential lease income for the McCauley properties. There was substantial evidence in the record from which the court could properly conclude that plaintiff's shares should be discounted to reflect their true value as non-controlling shares in a close family corporation. Given the broad discretion of a trial court under the principles of *Tome* we determine that the court properly exercised its discre-

tion in determining an appropriate discount value.

## WHETHER THE COURT ERRED IN DETERMINING PLAINTIFF'S SHARE OF WATER RIGHTS PROCEEDS AND WHETHER DEFENDANTS WERE EQUITABLY ESTOPPED FROM PRESENTING EVIDENCE CONCERNING OWNERSHIP OF WATER RIGHTS

During the divorce proceedings between LaVerne and Fred McCauley, plaintiff admitted having withdrawn partnership and corporate funds for her own benefit, and stipulated as to a certain sum which was owed to the corporation. The parties also stipulated that should the corporation seek to collect the amount owing, plaintiff could assert, as a set-off, an entitlement to certain proceeds from a sale of water rights. The parties' stipulation was incorporated into the final decree of divorce.

When plaintiff filed her complaint for dissolution of the corporation, defendants, by counterclaim, sought to collect the amounts which plaintiff had withdrawn from the partnership and corporation and which were owing. Plaintiff replied to defendants' counterclaim by alleging that the corporation owed her $86,250 from the sale of water rights.

In pretrial proceedings, plaintiff and defendants again stipulated that plaintiff owed the corporation the principle sum of $75,590 at 8% interest from 1971, less certain sums repaid by plaintiff. Plaintiff also advised defendants that she would proceed on her claim for set-off resulting from the water rights proceedings.

The water rights dispute arose from a sale of water rights in December of 1970, shortly after the corporation was formed. Prior to the sale, all property owned by the directors had been transferred to the corporation. In December of 1970, Pacific Western Land Company purchased water rights appurtenant to properties previously owned by the partnership and transferred to the corporation.

The dispute concerned the ownership of the rights and entitlement to the proceeds of the sale. The corporation contended that the land and the pertinent water rights were owned by the corporation and all proceeds belonged exclusively to the corporation. Plaintiff, on the other hand, argued that the water rights were owned by the individuals, had never been transferred to the corporation, and that she was entitled to a community property interest in the proceeds from the sale.

The court found that plaintiff was entitled to a community property interest in the water rights which were acquired during her marriage to defendant, and the court determined plaintiff's entitlement to be $6,457 at 8% interest. On appeal, plaintiff argues that the court should have found that she was entitled to a community property interest in the amount of $49,187.50. Secondly, plaintiff claims that the corporation was equitably estopped from presenting evidence or arguing that the water rights belonged to the corporation rather than to the individuals.

Plaintiff does not argue an absence of evidence to support the trial court's findings on the water rights ownership, but rather, refers to evidence favorable to her position. We agree that evidence was presented from which the court could have found in favor of plaintiff on this issue. On appeal, however, we are not to concern ourselves with evidence which favors the appellant's point of view, but only with evidence that supports the trial court's determination. *State v. Lujan*, 103 N.M. 667, 712 P.2d 13 (Ct.App.1985).

Evidence was presented from which the court could determine that at the time the partnership was created, Tom and Marie McCauley owned five-sixths interest and Fred McCauley owned one-sixth interest. There was evidence to indicate that after Fred and LaVerne married, the partnership acquired two separate parcels of land, one known as the Carlson Ranch, the other known as the Woods Property. Evidence was presented showing that 196.3 acres of water rights were sold for the sum of $208,316, or a per acre price of approximately $1,060.67. Defendants presented

testimony indicating that 71.3 acres of water rights were attributed to the Woods and the Carlson properties. Thus, there was testimony from which the court could determine that LaVerne was entitled to a community interest of one-half of Fred's one-sixth interest in the water rights, or, as the court determined, $6,457. After allowing a proper offset for plaintiff's communal interest in the water rights, at 8% interest, the court determined that plaintiff owed the corporation $137,200 for the sums previously withdrawn from the partnership and corporation. This finding is supported by the court record.

Plaintiff's second argument, that the corporation should be equitably estopped from presenting evidence concerning its ownership of the water rights, cannot be sustained. Equitable estoppel is an affirmative defense which must be affirmatively pled or waived. NMSA 1978, Civ.P.R. 8(c) (Repl.Pamp.1980). *See Xorbox v. Naturita Supply Co.*, 101 N.M. 337, 681 P.2d 1114 (1984); *Santistevan v. Centinel Bank of Taos*, 96 N.M. 730, 634 P.2d 1282 (1981).

▮ Plaintiff did not raise equitable estoppel as an affirmative defense in her reply to defendants' counterclaim, and is barred from doing so on appeal. NMSA 1978, Civ.P.R. 11 (Repl.Pamp.1980); *Montano v. Saavedra*, 70 N.M. 332, 373 P.2d 824 (1962).

A review of the record further indicates that much evidence concerning the corporation's claim of ownership of water rights was presented through various witnesses prior to plaintiff's estoppel objection on the last day of trial. Additionally, plaintiff failed to tender proposed findings on its defense of equitable estoppel. Facts or issues litigated during trial may, under limited conditions, be considered as affirmative defenses. *Prinz v. Greate Bay Casino Corp.*, 705 F.2d 692 (3rd Cir.1983); *Terrill v. Western American Life Insurance Co.*, 85 N.M. 456, 513 P.2d 390 (1973). In this case, however, plaintiff's failure to plead equitable estoppel, to request specific findings on equitable estoppel or to object to the presentation of defendants' water rights evidence resulted in a failure to preserve error. We determine that plaintiff is barred from asserting equitable estoppel and that there was substantial evidence to support the trial court's finding concerning plaintiff's communal interest in water rights proceeds.

In sum, we determine that the trial court's findings are supported by substantial evidence and its conclusions are in accord with the law. The court's judgment is affirmed, with the exception that the portion of the judgment awarding plaintiff an undivided interest in oil, gas and subsurface mineral rights must be stricken. This matter is remanded to the trial court for entry of a modified judgment in accordance with this opinion. Parties shall bear their own appellate costs.

IT IS SO ORDERED.

DONNELLY and BIVINS, JJ.