This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**PATRICIO TORRES, individually**
**and derivatively on behalf of**
**MONTAÑO/TORRES, LLC,**

 Plaintiff-Appellant,

v.             **NO. 30,207**

**ISIDRO E. MONTAÑO and**
**EVELYN N. MONTAÑO,**

 Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY**
**Camille Martinez Olguin, District Judge**

Kelley Law Offices
Cody K. Kelley
Charlotte L. Itoh
Albuquerque, NM

for Appellant

James Lawrence Sánchez Trial Lawyer, P.C.
James Lawrence Sánchez
Belen, NM

for Appellees

**MEMORANDUM OPINION**

**CASTILLO, Chief Judge.**

This suit involves a dispute over a family carwash business in Los Lunas, New Mexico. We must decide whether the majority owners properly dismissed their former son-in-law from the limited liability company in which they were the remaining members. We agree with the district court that the actions of the majority owners were not in breach of their fiduciary responsibilities and that there was no basis for the imposition of equitable remedies. While we acknowledge that sixteen months passed between trial and judgment, there is no basis to overturn the verdict on this ground. Accordingly, we affirm.

**BACKGROUND**

The following is a summary of the evidence presented during the bench trial of this case. In January 2003, Patricio Torres (Torres) and his wife, Cynthia Torres (Cynthia), formed a limited liability company, Montaño/Torres, LLC (Company), with Cynthia's parents, Isidro and Evelyn Montaño (the Montaños) for the purpose of opening a carwash in Los Lunas. Each family member held a 25 percent interest in the Company and agreed to contribute services toward its operation, though the specific type of services and number of hours to be worked were not specified at first. Patricio and Cynthia downloaded a standard business form from the Internet to guide

the functioning of the business. Cynthia tailored it to fit the Company, and all four members signed the documents, including the operating agreement (Operating Agreement). Each member contributed $25,000 in start-up capital. The Company secured a bank loan, backed by the Montaños' credit, with each member responsible for one-quarter of that liability. At the time of Torres's severance from the Company, the loan balance was $440,000. When the business first opened, the Montaños combined to work in the carwash 100 hours per week, maintaining the carwash and taking care of the bookkeeping. Torres, who had a full-time job outside the business, averaged about 24 hours of work per month, usually coming in after work on Mondays, Wednesdays, Fridays, and working every other weekend. He also was on call around the clock, via cell phone, in case a machine malfunctioned. Nonetheless, the Montaños urged Torres to improve his work habits and put in more hours in order to balance the workload among members.

Patricio and Cynthia split up shortly after the business was launched and divorced in August 2003. After the divorce, the Montaños sided at first with Torres over their daughter and, at his request, would give him between $1,000 and $2,000 per month on a quarterly basis, totaling $18,336 in 2004 and $20,394 in 2005. The Montaños claim that the money did not come from the proceeds of the carwash but rather from their personal funds, even though the money would sometimes be

transferred in envelopes marked "distribution" or "distrib." Torres said he considered them distributions, but he never reported them as income. Torres also made capital contributions of between $6,000 and $6,500 during that time, as did the Montaños.

In October 2004, Cynthia transferred her 25 percent interest in the Company to the Montaños, giving them a 75 percent share of the business—or a super-majority stake—and leaving Torres with the remaining 25 percent share of the Company. Around June 2006, the parties began negotiating a buyout of Torres's 25 percent share by the Montaños. At one point, the parties agreed that the Montaños would pay Torres $150,000 for his share, but the deal fell through when Torres balked at providing a receipt to the Montaños for the first $100,000 that was to be paid in cash. As negotiations broke down, the Montaños grew frustrated with the discrepancy in work hours and sought to codify the work responsibilities of the Company members. Using their majority voting power per the original Operating Agreement, the Montaños added an amendment specifying that each member was required to work at the carwash 100 hours per month between the hours of 8:00 a.m. and 8:00 p.m. and that each member was required to fill out daily time sheets; the amendment also provided a detailed list of tasks to be performed by all members on a regular basis. A member could be expelled with 30 days' notice for failure to perform the required work hours. The Montaños notified Torres of the amendment by letter on September

4

11, 2006. In the ensuing weeks, Torres refused to document his hours and failed to work the required hours. The Montaños sent Torres weekly accountings of his hours worked and detailing the shortages. They then voted on October 11, 2006, to remove Torres as a member of the Company.

Before that removal, Torres, on September 11, 2006, filed this action for dissolution of the Company and an accounting; breach of duty of good faith and fair dealing; and breach of fiduciary duty. Torres also sought the appointment of a receiver for the Company. He later amended his complaint based on prima facie tort and equitable relief for unjust enrichment. The Montaños counter-claimed alleging malicious abuse of process.

The district court held the trial on April 8 and 9, 2008, and it issued findings of fact and conclusions of law on July 30, 2009, and a final judgment on December 17, 2009. The district court found that the Montaños acted reasonably in amending the Operating Agreement and in removing Torres as a member of the Company, and the court refused to consider an equitable remedy. The court denied the Montaños' counterclaim. The Montaños do not appeal. Torres appeals and argues that the district court erred in finding that the Montaños acted reasonably and in rejecting his equitable relief. He also claims that the district court abused its discretion in taking almost 16 months between the end of the trial and the time it issued its findings of fact

and conclusions of law.

## DISCUSSION

**The Montaños Breached No Fiduciary Duty in Amending the Agreement and in Voting to Remove Torres**

Torres characterizes himself as an oppressed minority member of the Company and accuses the Montaños of abusing their super-majority power and squeezing him out of the business in violation of their duty of good faith and fair dealing under contract law.

"We review district court determinations for substantial evidence." *Garcia v. Garcia*, 2010-NMCA-014, ¶ 17, 147 N.M. 652, 227 P.3d 621, *cert. quashed*, 2010-NMCERT-007, 148 N.M. 611, 241 P.3d 612. "It is not this [C]ourt's task to reweigh evidence. If substantial evidence supports a [district] court's conclusion it will not be disturbed on appeal." *Landavazo v. Sanchez*, 111 N.M. 137, 138, 802 P.2d 1283, 1284 (1990). Substantial evidence is defined as "such relevant evidence that a reasonable mind would find adequate to support a conclusion. Evidence is substantial even if it barely tips the scales in favor of the party bearing the burden of proof." *Id.* (citations omitted). We review de novo the district court's application of the law to the facts at hand in reaching its legal conclusions. *Ponder v. State Farm Mut. Auto.*

6

*Ins. Co.*, 2000-NMSC-033, ¶ 7, 129 N.M. 698, 12 P.3d 960.

Torres concedes that the Montaños abided by the letter of the Operating Agreement. He also admits that he was not coerced into signing the agreement and that he was bound by its terms. Section 7.4 of the Operating Agreement provided for removal of a member by a super-majority vote if the member failed to substantially perform service to the Company as required and, upon removal, members were to receive their capital accounts. The Operating Agreement also allowed for amendments to be made in writing by a super majority.

The district court found that the amendment was made appropriately. The Montaños abided by the terms of the Operating Agreement by amending it to set out in detail the responsibilities of all members of the Company. After amending the Operating Agreement, the Montaños then followed the letter of it. They alerted Torres of the new requirements, gave him 30 days' notice of his possible removal, and then communicated to him in writing each week warning him of his failure to abide by the new service requirements. When he failed to fill out time sheets or in any other way show that he worked 100 hours in a month, they used their super-majority voting bloc to remove him. This was an Operating Agreement that Torres was familiar with, even though he admitted that he did not read it before signing it. Torres helped choose the format of the Operating Agreement from templates found on the Internet and was

7

reminded by the other members of the Company that service was required of each of them in order to keep the business functioning. "Each party to a contract has a duty to read and familiarize himself with its contents . . . , and if the contract is plain and unequivocal in its terms, each is ordinarily bound thereby." *Smith v. Price's Creameries, Div. of Creamland Dairies, Inc.*, 98 N.M. 541, 545, 650 P.2d 825, 829 (1982). The district court concluded that the Montaños' actions in amending the Operating Agreement and removing Torres were not a breach of fiduciary duty owed the Company or Torres.

As in *Smith*, Torres freely bargained for the terms of the Operating Agreement, and he knew or should have known about all the ramifications of entering into such a deal. We conclude that substantial evidence supports the district court's conclusion that Torres is bound by the terms of the Operating Agreement that were followed by the Montaños.

Torres argues further, though, that despite following the letter of the Operating Agreement, the Montaños' actions in ousting him were done with the intent to remove him from the Company, thus oppressing him as a minority shareholder in violation of their fiduciary responsibilities. He claims that they removed him in order to avoid paying him fair-market value for his 25 percent interest in the Company, and that they kept two sets of books and dealt in cash transactions in order to keep him from

assessing the fair-market value of his share. Therefore, we must continue our inquiry beyond standard contract law, because the fiduciary responsibilities in a small corporate setting are greater than in a typical commercial or business transaction. *See Walta v. Gallegos Law Firm, P.C.*, 2002-NMCA-015, ¶ 40, 131 N.M. 544, 40 P.3d 449. Notions of honor raise the bar in a fiduciary setting, and the standard in that context "is thus higher than the duty of good faith and fair dealing imposed on all contractual relationships." *Id.*

In the absence of extensive case law interpreting New Mexico's statute governing limited liability corporations (LLC or LLCs), we are assisted in our analysis by drawing an analogy to close corporations as analyzed in *Walta*. Limited liability companies enjoy an arm's-length relationship with legislatures and courts, because LLCs "are primarily creatures of contract." F. Hodge O'Neal & Robert B. Thompson, *O'Neal & Thompson's Close Corporations & LLCs: Law & Practice* § 5:2 (3d ed. 2004). The details of the functioning of a given LLC are grounded in the operating agreement, and "LLC statute and judicial interpretations both typically defer to the parties' agreement." *Id.* § 5:1. "Thus, courts have held that the LLC Act governs only in the absence of terms in the [Original] Agreement and that the statute fills gaps in the [Original] Agreement." *Id.* § 5:3 (footnotes omitted).

Still, as in close corporations, the oppression of a minority member of an LLC

9

is a valid concern. Similar to LLCs, close corporations are marked by a small number of stockholders, no willing market for the corporation's stock, and a significant role of the majority stockholders in the day-to-day management of the operation. *See Walta*, 2002-NMCA-015, ¶ 32. In *Walta*, which itself relied on partnership law to develop the law of close corporations, we warned: "These characteristics of close corporations may sometimes be abused to allow majority shareholders to take advantage of minority shareholders. Minority shareholders are vulnerable to a variety of oppressive devices." *Id.* ¶ 33.

We have previously tried to define oppressive treatment of a minority shareholder in a close corporation:

> The absence of a rigidly defined standard for determining what constitutes oppressive behavior enables courts to determine, on a case-by-case basis, whether the acts complained of serve to frustrate the legitimate expectations of minority shareholders, or whether the acts are of such severity as to warrant the requested relief.

*McCauley v. Tom McCauley & Son, Inc.*, 104 N.M. 523, 527, 724 P.2d 232, 236 (Ct. App. 1986). Specifically, we have looked for behavior by the majority that includes "harsh, dishonest[,] or wrongful conduct and a visible departure from the standards of fair[ ]dealing." *Id.* at 528, 724 P.2d at 237 (internal quotation marks and citation omitted). We also have warned that in small family operations, the court is to give weight to hostility among family members. *Id.* at 529, 724 P.2d at 238.

Continuing to analogize LLCs to close corporations, a comparison of the facts of our case to those in *McCauley* shows that the behavior of the Montaños is not on a par with the actions we found to be oppressive and unreasonable in *McCauley*. In *McCauley*, a minority member was cast out by the majority after divorcing a member of the dominant family. *Id.* at 526, 724 P.2d at 235. The facts revealed the following: LaVerne was married to the son of the founding family, the McCauleys. *Id.* at 524, 724 P.2d at 233. After the couple divorced, LaVerne found herself cut off from the basic essentials that had been previously provided to her—notably food and lodging for her and her children, clothing, and transportation. *Id.* at 529-30, 724 P.2d at 238-39. During and after the bitter divorce proceedings, LaVerne's husband warned that she "would never get a damned dime from the corporation" and then told the majority stockholders, falsely, that she stole and embezzled from the company. *Id.* at 530, 724 P.2d at 239. LaVerne was removed from her seat on the board of directors, and her first dividend after the divorce was $600, compared to her husband's $6,000. *Id.* at 531, 724 P.2d at 240. The corporation also failed to hold regular annual board meetings and stockholder meetings. *Id.* In sum, the majority stockholders clearly acted in a calculated way to punish LaVerne in the wake of her divorce from the corporation's principal member. We agreed with the district court in that case that those actions—which thwarted LaVerne's reasonable expectations of playing an

11

active role in the management of the business and sharing in its profits—thus rose to the level of oppressive conduct. *Id.*

In our case, the Montaños' actions do not rise to the level of oppression as those in *McCauley*, and substantial evidence exists to show that the Montaños acted reasonably in their relationship with Torres during his time as a member of the Company. The evidence shows the following. In 2004 and 2005, after he divorced their daughter, rather than turn against him they provided him with quarterly payments from their personal funds. They continued to work with Torres as an active member of the business and reminded him of their desire to have him contribute his fair share of services to the Company, finally putting it in writing in the final months of their business relationship. Before amending the Operating Agreement, they entered into good-faith negotiations to buy his share of the business, agreeing to a deal for $150,000 before Torres backed out at the last minute because he refused to recognize the transaction by providing the Montaños with a receipt for the $150,000 payment. And while Torres testified that the Montaños dealt only in cash and kept two sets of books in order to limit his ability to participate in operations or calculate the true market value of the business, he never produced evidence of hiding assets or unreported off-books income. The Montaños stated that they kept track of accounts receivable and accounts payable in one book. The Montaños also stated that Torres

12

never showed an interest in the financial operations of the business until the parties began negotiating a buyout. Finally, Torres admitted that he was capable of working the 100 hours of service required per month under the amendment to the Operating Agreement, but he chose not to do so.

We agree with the district court that the Montaños' actions cannot be characterized as "harsh, dishonest[,] or wrongful" or as a clear violation of the duty of fair dealing. *Id.* at 528, 724 P.2d at 237. Their actions were nothing like the behavior of the majority stockholders in *McCauley* who abused the minority member who had divorced their family member. In sum, absent uncontroverted evidence of coercion, fraud, or deceit on the part of the Montaños, substantial evidence existed for the district court here to have found that the Montaños acted reasonably in amending the Operating Agreement and voting to remove Torres as a member of the Company.

**District Court Properly Denied Equitable Relief**

Torres next asks us to declare that the district court abused its discretion when it declined to consider equitable relief for his claim for accounting and unjust enrichment. "The question of whether, on a particular set of facts, the district court is permitted to exercise its equitable powers is a question of law, while the issue of how the district court uses its equitable powers to provide an appropriate remedy is reviewed only for abuse of discretion." *United Props. Ltd. v. Walgreen Props., Inc.*,

2003-NMCA-140, ¶ 7, 134 N.M. 725, 82 P.3d 535. Under the standard of abuse of discretion, we will overturn a decision only where "the court's ruling exceeds the bounds of all reason" or is "arbitrary, fanciful, or unreasonable." *Edens v. Edens*, 2005-NMCA-033, ¶ 13, 137 N.M. 207, 109 P.3d 295 (internal quotation marks and citation omitted).

Courts tread carefully when deciding to venture into the realm of equitable relief in the world of contracts and business dealings. We have acknowledged a "broad public interest in protecting the right of private parties to be secure in the knowledge that their contracts will be enforced." *United Props. Ltd.*, 2003-NMCA-140, ¶ 10. And we have long relied on the proposition that "'courts may not rewrite obligations that the parties have freely bargained for themselves . . . [i]n the absence of fraud, unconscionability, or other grossly inequitable conduct.'" *Id.* (alterations in original) (quoting *Smith*, 98 N.M. at 545, 650 P.2d at 829, and *Winrock Inn Co. v. Prudential Ins. Co.*, 1996-NMCA-113, ¶ 36, 122 N.M. 562, 928 P.2d 947). "'Equity jurisdiction has never given the judiciary a roving commission' to do whatever it wishes in the name of fairness or public welfare." *Id.* ¶ 19 (quoting *In re Adoption of Francisco A.*, 116 N.M. 708, 730, 866 P.2d 1175, 1197 (Ct. App. 1993) (Hartz, J., concurring in part and dissenting in part)). "A court should thus not interfere with the bargain reached by the parties unless the court concludes that the

policy favoring freedom of contract ought to give way to one of the well-defined equitable exceptions, such as unconscionability, mistake, fraud, or illegality." *Nearburg v. Yates Petroleum Corp.*, 1997-NMCA-069, ¶ 31, 123 N.M. 526, 943 P.2d 560. Thus, our analysis is made against the "long-standing backdrop of New Mexico law enforcing contractual obligations as they are written." *United Props. Ltd.*, 2003-NMCA-140, ¶ 12.

In *United Properties, Ltd.*, we dealt with a lease agreement that was "clear as can be" and lacking in any ambiguity. *Id.* There, the tenant at a shopping center absent-mindedly forgot to meet the deadline to renew the lease at least 90 days before its expiration as required by the contract. *Id.* ¶ 4. When the tenant tried to renew the lease 40 days past the deadline, the landlord rejected the offer and refused to renew. *Id.* Because the tenant made an innocent mistake and had put nearly $2 million into the property, we were asked to offer the tenant equitable relief and forgive the technical oversight of a missed deadline. *Id.* ¶¶ 3, 26. We rejected that argument. *Id.* ¶ 26. Instead, we relied on the reasoning of the Iowa Supreme Court that sought to preserve "the sanctity and predictability of the written word[,]" and stated: "'We will not use equitable principles to save a party from the circumstances it created.'" *Id.* ¶ 31 (quoting *SDG Macerich Props., L.P. v. Stanek Inc.*, 648 N.W.2d 581, 587-88 (Iowa 2002)). Only when finding "fraud, real hardship, oppression, mistake, [or]

unconscionable results" in a contractual transaction, the Iowa court concluded, should a court exercise its equitable powers. *SDG Macerich Props., L.P.*, 648 N.W.2d at 588. In *United Properties, Ltd.*, we concluded that the tenant had lacked vigilance and thus should have been held to the written terms of the contract. 2003-NMCA-140, ¶ 31.

In our case, the district court decided that equitable relief was not available to Torres. We agree. Here, like in *United Properties*, the contract was clear on its face, and for the courts to step in would threaten to upset the bargaining nature of business dealings. A review of the evidence shows the following. Torres himself helped choose the form of business for the carwash and worked with his then-wife to download a form from the Internet and trusted her to tailor it to the needs of the Company. He was listed as a principal manager of the Company, along with Isidro Montaño. The terms of the Operating Agreement that he signed were straightforward and within the bounds of New Mexico statutes. The original document he signed required each member to contribute services to the operation, and it included provisions for amending the Original Agreement. When, by a majority vote, the service requirements were itemized and specified, he was made aware of them and was regularly reminded of them. While he was capable of meeting the requirements, he chose not to do so.

We long ago stated that "conduct that does not produce an injury, even though

16

objectionable to the protestants, does not call for judicial interference." *DiIaconi v. New Cal Corp.*, 97 N.M. 782, 788, 643 P.2d 1234, 1240 (Ct. App. 1982). Here, Torres essentially got out of this business what he put in—two years of payments from the Montaños and the return of his capital account. The contract is clear, and the actions of the Montaños do not rise to the level of requiring the courts to step in and provide equitable relief beyond standard legal remedies. We find no error in the district court refusing to consider an equitable remedy in this case.

Torres complains that the district court's findings of fact and conclusions of law suggest a rejection of equitable relief based on a finding of unclean hands. We note that the district court, in its findings of fact, stated that Torres failed to report his income from the Montaños and was not in a position to receive equitable relief, suggesting unclean hands on Torres's part. We agree with Torres that this is not an adequate foundation for denying equitable relief in this case. Our Supreme Court has previously stated that when misconduct is alleged under the unclean hands theory, that misconduct "must be related to the transaction giving rise to the claim involved." *Mechem v. City of Santa Fe*, 96 N.M. 668, 670, 634 P.2d 690, 692 (1981). In a situation such as this where a business partner is alleging a breach of fiduciary duty, the test is whether the one accused of unclean hands "dirtied them in acquiring the rights he now asserts[.]" *Id*. Here, Torres's failure to report income from the proceeds

17

of the carwash does not have "an immediate and necessary relation to the equity which the complainant seeks to enforce." *Romero v. Bank of the Southwest*, 2003-NMCA-124, ¶ 38, 135 N.M. 1, 83 P.3d 288 (internal quotation marks and citation omitted).

However, the district court's conclusions of law are all grounded in legal bases and principles of contract and, as we have shown above, there was substantial evidence to support the district court's determination that equitable relief was not proper in this case, notwithstanding the reason suggested by the district court. An appellate court may affirm a decision of the district court if it is right for any reason, as long as it is supported by sufficient evidence. *Meiboom v. Watson*, 2000-NMSC-004, ¶ 20, 128 N.M. 536, 994 P.2d 1154. Thus, it was not error for the district court to deny equitable relief in this case.

**The Almost Sixteen-Month Wait for a Ruling Did Not Harm or Prejudice Torres**

Finally, Torres complains that while the trial was held in early April 2008, the district court did not issue findings of fact and conclusions of law until late July 2009, and a judgment was not issued until December 2009. He argues that the trial judge, over a stretch of time spanning nearly 16 months, could not be expected to accurately recall and evaluate the evidence brought forward by both sides and would have trouble weighing the credibility of witnesses.

Torres cites to no statute or case law that imposes a specific time limit on judges

to dispose of cases. He grounds his argument in two portions of the New Mexico Rules of Civil Procedure calling for "speedy" determinations and a resolution of cases "promptly" and "efficiently." Rule 1-001(A) NMRA; Rule 21-300(B)(8) NMRA. Both rules are certainly open to interpretation and judicial discretion, depending on context. Torres points to out-of-state authority—an Arkansas case in which the opinion of a foot-dragging judge was sent to the state's disciplinary committee for consideration and a West Virginia case in which a judge who had delayed a ruling for 33 months was ordered to issue one within 30 days. A second West Virginia case similarly resulted in a writ of mandamus ordering a decision to be rendered after a delay of 17 months. None of the lower court decisions in those cases were overturned. If anything, Torres's argument highlights the fact that at no time during the nearly 16 months between the end of trial and the issuing of findings of fact and conclusions of law did he file a motion with the district court seeking a resolution or a petition at the appellate level seeking a writ of mandamus. In fact, for the first two months after the trial, the district court had not even received Torres's own proposed findings of fact and conclusions of law.

Further, Torres provides no evidence of true prejudice that resulted from the delay of more than a year. The only finding of fact he can challenge in the district court's ruling is that the court confused an exchange of small bills for large bills with

an exchange of coins for bills. Thus, no material error was made by the district court in rendering its findings of fact and conclusions of law. Therefore, we decline to overturn the verdict in these circumstances.

**CONCLUSION**

For the foregoing reasons, we affirm the judgment of the district court.

**IT IS SO ORDERED.**

_____
**CELIA FOY CASTILLO, Chief Judge**

**WE CONCUR:**

_____
**RODERICK T. KENNEDY, Judge**

_____
**TIMOTHY L. GARCIA, Judge**