IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMCA-080

Filing Date: June 29, 2009

Docket No.  27,910, consolidated with 28,318

MIKE SKEEN and GAIL SKEEN, husband
and wife, and MARY HELEN SKEEN,
individually and in her capacity as Attorney-
in-Fact for Joseph R. Skeen and Mary Elisa Livingston,

　　Plaintiffs-Appellees,

v.

BOB BOYLES, deceased, and JIM BOYLES,

　　Defendants-Appellants.

APPEAL FROM THE DISTRICT COURT OF LINCOLN COUNTY
Karen L. Parsons, District Judge

Tucker Law Firm, P.C.
Steven L. Tucker
Santa Fe, NM

David M. Stevens, Attorneys at Law, P.C.
David M. Stevens
Ruidoso, NM

for Appellees

Caren I. Friedman
Santa Fe, NM

Stevens and Associates
J. Monty Stevens
El Paso, Tx

for Appellants

## OPINION

1

**BUSTAMANTE, Judge.**

**{1}**     This case centers on the effect of a written land ownership and well-sharing agreement (Agreement) entered into some fifty years ago by the owners of adjacent ranches in southern New Mexico.   The Agreement contained a provision that the ranch owners—Joseph and Mary Helen Skeen, and William and Ramona Treat—would maintain wells located on their respective properties and supply water to each other's ranches for livestock.  Defendants Bob and Jim Boyles (the Boyles) are the Treat's successors-in-interest.   The district court ruled that the Agreement created a reciprocal easement appurtenant that ran with the land, that the easement placed a duty on the Boyles, as the Treats' successors-in-interest, to supply water to the Skeens, and that the Boyles breached that duty.  The district court awarded compensatory and punitive damages as well as attorney fees to Plaintiffs.

**{2}**     The Boyles appeal, arguing that the Agreement at most created a license that was unilaterally revocable or that they had no affirmative duty to supply water.  The Boyles argue that the actual damages were improper because the Skeens failed to mitigate and that punitive damages are improper because they lacked culpability sufficient to justify the award.  In a separate appeal the Boyles challenge the district court's award of attorney fees in favor of the Skeens.  The award was based on the Skeens' unopposed motion because the Boyles failed to timely respond, and their request for an extension of time was denied.  We consolidate the appeals and affirm all holdings of the district court in the main appeal.  We reverse the attorney fee award and remand for further consideration.

**BACKGROUND**

**{3}**     The Boyles and the Skeens own adjacent ranches in Lincoln County, New Mexico. Both ranches were, at one time, owned by the Skeens' ancestors.  Mary Helen Skeen, and her late husband Joe, bought their ranch from Joe's grandmother in 1951. Joe's grandmother had another grandson, William Treat, who along with his wife Ramona, bought the adjacent property.  On February 17, 1959, Joe and Mary Skeen and William and Ramona Treat executed the Agreement clarifying ownership of certain property and agreeing to share water from two wells, one located on each of their respective properties.  Pursuant to the Agreement, the Skeens had the right to use water from the Treats' Dry Pasture Well, and the Treats had the right to use water from the Skeens' Headquarters Well.  The Agreement in its entirety provides:

> WHEREAS, William C. Treat and Ramona Treat, his wife, are the holders of a State Lease covering the NW1/4SW1/4 of Section 6, in Township 14 South, Range 19 East, N.M.P.M. in Chaves County, New Mexico, and,
>
> WHEREAS, Joseph R. Skeen and Mary Helen Skeen, his wife, are the owners of the E1/2NE1/4 of Section 23, Township 13 South, Range 18 East, N.M.P.M. in Lincoln County, New Mexico, and

WHEREAS, each party desires to agree as to the ownership and rights to such property and to give to the other a right to obtain water from the premises owned or leased by them for the purpose of watering livestock.

NOW THEREFORE, for considerations received, the receipt of which are hereby acknowledged, William C. Treat and Ramona Treat, his wife, do hereby release and quitclaim to Joseph R. Skeen and Mary Helen Skeen, his wife, the E1/2NE1/4 of Section 23, Township 13 South, Range 18 East, N.M.P.M., excepting and reserving to themselves a right to go over and across the NE1/4NE1/4 of Section 23 for the purpose of obtaining water from the well located on the premises in such amount as may be necessary for the purpose of watering livestock owned by them, and Joseph R. Skeen and Mary Helen Skeen, his wife, do hereby release and convey to William C. Treat and Ramona Treat, his wife, any interest they have in and to the NW1/4SW1/4 of Section 6, in Township 14 South, Range 19 East, N.M.P.M., and William C. Treat and Ramona Treat, his wife, hereby grant to Joseph R. Skeen and Mary Helen Skeen, his wife, a right to go over and across this property for the purpose of obtaining water from the well located on these premises, in such amount as may be necessary for the purpose of watering livestock owned by them.

Each party agrees to maintain the well on the premises owned or leased by them, and to supply such water as may be necessary for the other, and each party agrees to maintain his own tanks and tubs for the purpose of watering livestock.

{4}     In 1964 William and Ramona Treat conveyed their ranch, including the Dry Pasture Well, to their son Anthony Treat. Anthony Treat owned the ranch for approximately thirty years. During his tenure on the ranch, Anthony Treat performed the necessary maintenance on the Dry Pasture Well, and always honored the Agreement with the Skeens.

{5}     In 1995 Anthony Treat conveyed the ranch to the Boyles. Anthony did not provide the Boyles with a copy of the Agreement, but he orally advised them of the existence of a water sharing agreement concerning the Dry Pasture Well. The district court found that the Boyles were aware of their obligation to provide water to the Skeens. The Boyles acknowledged that they knew of the Agreement, but asserted they thought the obligation could be unilaterally terminated by either party.

{6}     In the spring of 2001, in the midst of a severe drought, the Dry Pasture Well quit pumping water. Mike Skeen noticed that the well had stopped producing water and contacted Jim Boyles. Jim Boyles testified that he personally made efforts to get the well back online, but that nothing worked and so he assumed that the water table had dropped. Jim Boyles told Mike Skeen that he was attempting to repair the well and that he had called Keys Windmill for service on the well, but that "the sorry son of a guns would never get out there and get on the job." However, when Mike Skeen called Keys Windmill to inquire about their unresponsiveness, he was informed that Keys had never received any service call

3

for the Dry Pasture Well. The district court found that Jim Boyles never actually made the request and that he lied about having called Keys Windmill.

{7}     In August 2001 Jim Boyles called in a well expert, Ken Wheeler, ostensibly to inspect the Dry Pasture Well. Mr. Wheeler determined that the depth of the well to bottom was 600 feet, and that while there was water in the well starting at 545 feet below the surface, the well cylinder penetrated to a depth of only 505 feet. Thus, there was a forty-foot gap between the water's surface and the well cylinder. Mr. Wheeler also found that the well had been damaged by a cave-in. Based on his findings, Mr. Wheeler felt the well should be abandoned. Jim Boyles eventually abandoned the well by removing all of the pumping equipment, including the windmill, and installing a welded cap.

{8}     In September 2001 Mike Skeen brought in a different well expert, Charlie Lewis, to evaluate the Dry Pasture Well. Mr. Lewis measured the depth of the well, employing two methods of measurement. First, a rod was lowered into the well while measuring the length of cable required to reach the bottom. Next, a sonic measuring device was used to determine the depth to the water. Mr. Lewis's findings were inconsistent with those of Mr. Wheeler. Based on his measurements, Mr. Lewis determined that the depth to the bottom was 519 feet and that there was water in the well starting 312 feet below the surface. Thus, Mr. Lewis determined that the well was capable of producing because it contained a little more than 200 feet of water. In October of the following year, the Skeens had Mr. Lewis install pumping equipment at the Dry Pasture Well, and it consistently produced twelve to thirteen gallons per minute. Four days later, Mr. Lewis and Mike Skeen recapped the well out of concern that it could be easily ruined if something fell down the pipe. The district court reviewed a video tape of the process employed by Mr. Lewis, including measuring the depth of the well, installing the pumping equipment, and the actual pumping of water from the Dry Pasture Well. The district court determined that Mr. Lewis's findings most accurately represented the actual characteristics of the well.

{9}     Ken Wheeler passed away before this case went to trial. In his deposition testimony, prior to his death, he explained that one possible reason for Mr. Lewis's conflicting findings could have been that another water strata had broken into the well as a result of an earthquake. However, Mr. Lewis testified that there had been no seismic activity in the area and that he had never heard of any seismic activity effecting the wells in that area.

{10}     The district court found that the actual reason for the discrepancies was that the Boyles directed Mr. Wheeler to measure the wrong well. This was based on the court's findings that the Boyles own another well, the Divide Well, which bears characteristics consistent with the findings of Mr. Wheeler. The court found that there was no way that Mr. Wheeler's measurements were made at the Dry Pasture Well and that the Boyles intentionally misled Mr. Wheeler by taking him to the Divide Well and telling him that it was the Dry Pasture Well.

{11}     Based on Mr. Lewis's findings, the Skeens were aware as of September 2001 that the Dry Pasture Well could in fact produce water. However, the Skeens did not inform the Boyles of this fact until 2003. In addition, the Skeens did not install a pump at the Dry

Pasture Well to begin regularly pumping water until January 2003. When they did install a pump, they found it practically impossible to reinstall a windmill at the site because the stub legs supporting the original windmill tower were cut too short when it was dismantled by the Boyles. The Skeens had to instead bring a gas generator to the site. Since that time, the Skeens have continued to haul gasoline to run the generator, and the Dry Pasture Well has never failed to produce water.

{12}     During the period that the well was not operating, from approximately May 2001 through January 2003, the Skeens regularly hauled water to the livestock tank supplied by the Dry Pasture Well. This was a considerable undertaking, requiring the construction of a water hauling trailer and regular four-hour round trips across rugged terrain in order to deliver water to the tank. The district court awarded the Skeens actual damages in the amount of $60,290.62, for damages incurred from the time they first began hauling water to the Dry Pasture Well.

{13}     The Boyles argue that the Skeens failed to mitigate their damages. Specifically, the Skeens failed to inform the Boyles that the well was actually operational, and they continued to haul water after September 2001 even after they knew that the Dry Pasture Well could produce. The Boyles argue that reasonable persons under those circumstances would not have continued to haul water to their economic detriment without notifying the Boyles that the well was working, or without simply pumping water from the well themselves.

{14}     The district court considered not awarding actual damages to the Skeens for the period after September 2001 because the Skeens should have informed the Boyles of their discovery. But ultimately, the court determined that earlier notice to the Boyles should not effect the damages calculation because, even after they were informed, they took no corrective action and were unlikely to have taken corrective action had they been told earlier. Thus, the district court found that actual damages were warranted for the entire time the well was non-operational.

{15}     The district court also awarded punitive damages to the Skeens in the amount of $482,324.96, or eight times the actual damages. This award was based on findings and conclusions that the Boyles misled their well expert, lied about trying to fix the well, intentionally deprived the Skeens of water by intentionally disabling the Dry Pasture Well, and failed to make the well operational even after learning that it could produce water. The district court concluded that these acts were deliberate and deceitful, "reprehensible at best . . . and in gross disregard of the rights of [the] Skeen[s] displaying an arrogant disregard for contractual obligations and any sense of what is right."

**DISCUSSION**

**The Easement was Appurtenant and Imposed a Duty Upon the Boyles as the Treat's Successors**

{16}     The basic issue in the case is whether the Agreement created an easement appurtenant which placed a duty on the Boyles, as the Treats' successors-in-interest, to

supply water to the Skeens from the Dry Pasture Well. The Boyles argue that the Agreement created a license that could be unilaterally revoked at will and that they had no duty under the Agreement to maintain the Dry Pasture Well or supply water to the Skeens. The Boyles point out that the Agreement does not state a duration of effectiveness and does not state that it would bind successors-in-interest. We disagree and affirm the finding of the district court that the Agreement created an easement appurtenant to which the Boyles were subject.

**{17}** Whether the Agreement created an easement appurtenant imposing a duty on the Boyles is a mixed question of law and fact. We "conduct a de novo review of the [district] court's application of the law to th[e] facts," and we review the district court's findings of fact for substantial evidence. *Reule Sun Corp. v. Valles*, 2008-NMCA-115, ¶ 12, 144 N.M. 736, 191 P.3d 1197 (internal quotation marks and citation omitted), *cert. granted*, 2008-NMCERT-008, 145 N.M. 255, 195 P.3d 1267. In viewing the facts that were determined by the district court, "[t]he question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Id.* (internal quotation marks and citation omitted).

**{18}** The Boyles are correct that whether an easement has been created is determined according to the intent of the parties. *See Olson v. H & B Props. Inc.*, 118 N.M. 495, 498, 882 P.2d 536, 539 (1994) (stating that an easement should be construed according to the intent of the parties). The Boyles are also correct that the intentions of the parties can be revealed by the language contained in the Agreement. *See Camino Sin Pasada Neighborhood Ass'n v. Rockstroh*, 119 N.M. 212, 214, 889 P.2d 247, 249 (Ct. App. 1994) (stating that "the intention of the parties is to be ascertained from the language employed, viewed in light of the surrounding circumstances"). However, they are incorrect that absence of a term of duration or language addressing successors-in-interest is determinative. "[N]o particular words of grant are necessary" to find an easement or discern an intent by the parties to create one. *Id.* (internal quotation marks and citation omitted). "Any words which clearly show intention to grant an easement are sufficient, provided the language is certain and definite in its term." *Id.* (emphasis omitted) (internal quotation marks and citation omitted).

**{19}** Intent to create an easement may be inferred from an analysis of the language as it relates to the nature of the right created. For example, in *Martinez v. Martinez*, 93 N.M. 673, 675, 604 P.2d 366, 368 (1979), the intent to create an easement was inferred from language in a deed providing for "rights of ingress and egress[,]" even though there was no express granting language. *Id.* (internal quotation marks omitted). There, the court recognized that the term "easement" is generic for a "liberty, privilege, right or advantage which one has in the land of another." *Id.* (internal quotation marks and citation omitted).

**{20}** Further, while specific language is not required, the words "grant" or "excepting and reserving" in a document transferring an interest in real property reveal an intent to create an easement. In *Evans v. Taraszkiewicz*, 510 N.Y.S.2d 243, 243, 244 (N.Y. App. Div. 1986), the court considered whether certain language in a deed created an easement or a license to take water from a spring on adjacent land. The relevant language stated that the grantees were "*hereby granted* the right to use water for domestic purposes from the spring on the

6

lands of the grantors . . . together with the *right to lay, maintain and repair the necessary pipes*." *Id.* at 243 (emphasis added). The court in *Evans* concluded that an appurtenant easement was created based on several factors: The grant was accomplished with a transfer of interest in real property, the language used included the word "grant," the grantors did not purport to retain any rights of revocation, and while specific words of inheritance were not used, such words were not required to create a perpetual easement. *Id.* at 243-44. Similarly, in *Kennedy v. Bond*, 80 N.M. 734, 735, 460 P.2d 809, 810 (1969), the court determined that an easement was created by a deed containing the language "[e]xcepting and reserving the following" (internal quotation marks omitted). Thus, even though specific language is not required, certain granting language, together with a transfer of an interest in land, is sufficient to create an easement.

**{21}** Here, the nature of the right created the express language of the Agreement, and the surrounding circumstances indicate the creation of an express easement. The Agreement states that the Treats hereby grant "a right to go over and across" their property. This right is nearly identical to the "right of ingress and egress," which was found to describe the easement in *Martinez*, 93 N.M. at 675, 604 P.2d at 368. Specifically, a "right to go over and across" describes a "liberty, privilege, right or advantage which one has in the land of another." *Id.* (internal quotation marks and citation omitted). The Agreement is functionally indistinguishable from the instruments in *Martinez*, *Evans*, and *Kennedy*. The Agreement occurred in the context of a land transaction between the Treats and Skeens, wherein the Treats quitclaimed certain land to the Skeens, and the Skeens conveyed the interests they had in the Treats' property. In this context, the language "hereby grant" describes an express grant of an interest in land, in this case an easement. Given the express terms of the Agreement, together with the surrounding circumstances—the execution of a land transaction—the district court could properly find that an easement had been created.

**{22}** We also affirm the district court's conclusion that the easement created was appurtenant and was binding on successors-in-interest. "An appurtenant easement runs with the land to which it is appurtenant, . . . and passes with the land to a subsequent grantee with passage of the title." *Kikta v. Hughes*, 108 N.M. 61, 63, 766 P.2d 321, 323 (Ct. App. 1988) (citation omitted). "If the granting instrument does not specify whether the easement is appurtenant or in gross, the court decides from the surrounding circumstances . . . ." *Luevano v. Group One*, 108 N.M. 774, 777, 779 P.2d 552, 555 (Ct. App. 1989) (internal quotation marks and citation omitted). In making this decision, there is a "strong constructional preference for appurtenant easements over easements in gross." *Brooks v. Tanner*, 101 N.M. 203, 206, 680 P.2d 343, 346 (1984). "Easements are presumed appurtenant unless there is clear evidence to the contrary." *Luevano*, 108 N.M. at 777, 779 P.2d at 555.

**{23}** Where the circumstances surrounding a grant of an easement benefit the grantees as adjacent landowners, it may be inferred that the grant was of an easement appurtenant. In *Luevano*, we considered whether an easement granted for the purpose of allowing for convenient access of the grantee's land was appurtenant or in gross. *Id.* We held that since the easement was intended to benefit grantees as owners of adjoining property, an easement appurtenant could be inferred. *Id.* In reaching this conclusion, we recognized that in such

7

cases if a grantee were to sell their land, no benefit would be derived from retaining the easement because they would have little to no need for convenient access to land no longer owned. *Id.* Conversely, there would be considerable benefit to successors-in-interest in the land who would benefit from the convenient access. *Id.* Under such circumstances, it is reasonable to conclude that the intent was to create an easement appurtenant. *Id.*

**{24}** Here, we find no evidence to rebut the strong constructional preference and presumption of appurtenance. On the contrary, granting of the easement benefitted the grantees as landowners, and thus, pursuant to *Luevano* it can reasonably be inferred that the Agreement was intended to create an easement appurtenant. For example, the easement benefitted the Skeens only in their capacity as ranchers in need of a water source on their adjoining land. As in *Luevano*, if the Skeens were to sell their ranch to some other ranch operator, and move their livestock to some other area, it would be difficult to envision what benefit would be derived by their personal retention of the easement. Conversely, the record describes how difficult it actually is to truck water into this area, and it would be of considerable benefit to any ranching operation to have access to water from the Dry Pasture Well. Therefore, the easement is appurtenant.

**{25}** The district court's ruling is also supported by the testimony of Plaintiff Mary Helen Skeen, the only surviving signatory to the Agreement. Mrs. Skeen testified that the water sharing was oral before it was committed to writing. Recalling what prompted the Agreement, Mrs. Skeen testified that they all (the Treats and Skeens) "decided [to do this] for future generations." This is a clear indication of an intent to bind successors-in-interest.

**{26}** The Boyles argue that even if an easement appurtenant was created, they still had no duty to actually supply water to the Skeens. We disagree. Generally, the owner of a servient estate is under no duty to repair or maintain an easement. *McGarry v. Scott*, 2003-NMSC-016, ¶ 21, 134 N.M. 32, 72 P.3d 608. However, a special agreement may impose such a duty. *See id.* (stating that "[t]he owner of the servient estate is under no obligation, in the absence of [a] special agreement, to repair or maintain the way . . . .") (first alteration in original) (internal quotation marks and citation omitted). Here, the Agreement provides that "[e]ach party agrees to maintain the well on the premises owned or leased by them and to supply such water as may be necessary for the other." On its face, this language imposes a duty under the easement by special agreement. Therefore, the district court properly found that the Boyles had an affirmative duty to maintain the Dry Pasture Well and to supply water to the Skeens, and that this duty was breached.

**The Boyles Had Notice of the Easement and Associated Duty**

**{27}** Having found that an easement imposing a duty on successors-in-interest was created, we now turn to whether the Boyles may be properly charged with notice of the existence of that duty. We conclude that the Boyles had notice of the easement created by the Agreement because the Agreement was properly recorded and because the Boyles were informed of the Agreement by Anthony Treat.

8

**{28}** New Mexico's recording statutes provide that all "writings affecting the title to real estate shall be recorded in the office of the county clerk of the county or counties in which the real estate affected thereby is situated." NMSA 1978, § 14-9-1 (1981). "Such records shall be notice to all the world of the existence and contents of the instruments so recorded . . . ." NMSA 1978, § 14-9-2 (1886). "Notice of an easement will be imputed to a purchaser where the easement is properly recorded or is of such character that a purchaser acting with ordinary diligence would learn of its existence." *Sedillo Title Guar., Inc. v. Wagner*, 80 N.M. 429, 431, 457 P.2d 361, 363 (1969) (internal quotation marks and citation omitted).

**{29}** Here, the Agreement was recorded in both Chaves and Lincoln Counties. This alone is sufficient to have put the Boyles on constructive notice pursuant to the recording statutes. Anthony Treat also testified that he orally advised the Boyles of the existence of a water sharing agreement for the Dry Pasture Well. Although Mr. Treat did not provide an actual copy of the Agreement, his oral advice was sufficient to prompt a person of ordinary diligence to inquire further. Thus, the Boyles had inquiry notice of the Agreement. *See id.* (stating that "[t]he law imputes to a purchaser such knowledge as he would have acquired by the exercise of ordinary diligence [and] the owner of the servient tenement is charged with notice of facts which an inquiry would have disclosed" (internal quotation marks and citation omitted)).

**Mitigation of Actual Damages**

**{30}** The Boyles argue that the Skeens took insufficient or unreasonable measures to mitigate their damages and that, as a result, the award of compensatory damages should have been reduced. First, the Boyles argue that the Skeens' failure to inform them that the Dry Pasture Well was actually operational in September of 2001 deprived them of the opportunity to take corrective action which would have reduced the Skeens' damages. Second, they argue that the Skeens would not have accrued their damages if they had begun pumping water themselves in September of 2001, instead of waiting until January 2003. We affirm the district court's determination that the Skeens acted reasonably in mitigating their damages.

**{31}** "It is a well established principle in New Mexico that an injured party has a responsibility to mitigate its damages, or run the risk that any award of damages will be offset by the amount attributable to its own conduct." *Air Ruidoso, Ltd. v. Executive Aviation Ctr., Inc.*, 1996-NMSC-042, ¶ 14, 122 N.M. 71, 920 P.2d 1025 (citation omitted). "[M]itigation is designed to discourage persons . . . from passively suffering economic loss which could [have been] averted by reasonable efforts." *Hickey v. Griggs*, 106 N.M. 27, 29, 738 P.2d 899, 902 (1987). Here, the district court concluded that the Skeens reasonably mitigated their damages by hauling water to their storage tank at the Dry Pasture Well and subsequently installing a submersible pump. We will uphold the district court's award of damages if its determination that these were reasonable mitigation measures is supported by substantial evidence. *Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, ¶ 12, 140 N.M. 478, 143 P.3d 717.

**{32}** Substantial evidence supports the district court's finding that the timing of the Skeens' disclosure did not constitute a failure to mitigate. The Boyles asserted at trial, and continue to maintain, that the Agreement created a revocable license under which they never had any affirmative duty to supply water. The Boyles also testified that their litigation strategy was to keep the status quo by continuing to not supply water to the Skeens. Other testimony indicated that the Boyles did not like having to give water to the Skeens, that they planned to cut off their water at the Dry Pasture Well, and that they were unwilling to make the Dry Pasture Well operational. Based on this evidence, the court was justified in concluding that even if the Skeens would have informed the Boyles of their September 2001 findings, the Boyles would not have taken any corrective action, and that the timing of the Skeens' disclosure was not a failure to mitigate. These findings support the district court's decision that the Skeens' efforts to haul water was a reasonable mitigation measure, especially considering the alternatives of stopping their livestock operation in the Dry Pasture Well area altogether or allowing their livestock to simply waste away from a lack of water.

**{33}** Furthermore, the Skeens were not required to immediately take the initiative to make the Dry Pasture Well operational when the Boyles had represented that they were in the process of fixing the well themselves. The record reflects that the Boyles told the Skeens that they were working to fix the well. Under these facts, where the circumstances presented a reasonable indication that the Boyles were in the process of remedying the problem, the Skeens were justified in their delayed attempts to pump water themselves. *See Manouchehri v. Heim*, 1997-NMCA-052, ¶ 21, 123 N.M. 439, 941 P.2d 978 (holding that it was not unreasonable as a matter of law to delay mitigating damages based on a reasonable reliance on a breaching party's assurances that the breach will be remedied); *see also Shearson Hayden Stone, Inc. v. Leach*, 583 F.2d 367, 371 (7th Cir. 1978) (stating "if assurances are made that performance will be forthcoming, or if other circumstances indicate that the breaching party intends to perform, then, even though the contract has been breached, no duty to mitigate arises." (internal quotation marks and citation omitted)). Thus, even if pumping water from the Dry Pasture Well was a more reasonable method of mitigation, the district court was justified in its conclusion that the Skeens acted reasonably in their delay in attempting to pump water, and hauling water in the interim.

**{34}** Finally, even if the Skeens could have pumped water sooner, it was not required of them. Mitigation of damages is required only to the extent that a loss to the injured party could have been avoided without undue risk or burden. *Manouchehri*, 1997-NMCA-052, ¶ 21. Here, the Skeens were not sure of the nature or extent of the problem at the well, and the record reflects their concern about working on the well at their own initiative and possibly creating a "big mess." Furthermore, the Skeens were concerned that the well or their equipment could be ruined while left unattended. Therefore, mitigation did not require the Skeens to bear any undue risk associated with pumping water at an earlier time.

**{35}** Without challenging the actual amount awarded, the Boyles argue that punitive damages were improper because the Agreement created a revocable license or contract under which they had no affirmative duty. The Boyles also argue that, even if punitive damages could be awarded in this case, they lacked the culpability to support such an award. Having

determined that the Agreement actually created an easement, we address only the Boyles'
assertion that they lacked the culpable mental state sufficient to support an award of punitive
damages.

**{36}**　"To be liable for punitive damages, a wrongdoer must have some culpable mental
state, . . . and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless,
oppressive, or fraudulent level." *Clay v. Ferrellgas, Inc.*, 118 N.M. 266, 269, 881 P.2d 11, 14
(1994) (citations omitted). "Punitive damages . . . are not awarded as a matter of right, but
lie within the sound discretion of the [district] court." *Peters Corp. v. N.M. Banquest
Investors Corp.*, 2008-NMSC-039, ¶ 43, 144 N.M. 434, 188 P.3d 1185 (first alteration in
original) (internal quotation marks and citation omitted). Here, the district court determined
that punitive damages were proper based on its conclusions that the Boyles acted willfully
and wantonly by intentionally disabling the Dry Pasture Well and permanently removing the
pumping equipment. We review the court's decision to award punitive damages based on
these findings for abuse of discretion and we will reverse that decision only if it is "contrary
to logic and reason." *Id.* (internal quotation marks and citation omitted).

**{37}**　The court's conclusions that the Boyles actions were "willful, wanton and in gross
disregard of the [Skeens'] rights" are supported by its findings. We recognize that the
district court heard conflicting evidence on some matters, but we defer to its determinations
of ultimate fact, given that we lack opportunity to observe demeanor, and we cannot weigh
the credibility of live witnesses. *Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124,
127, 767 P.2d 363, 366 (Ct. App. 1988), *holding modified on other grounds by Delgado v.
Phelps Dodge Chino, Inc.,* 2001-NMSC-034, ¶ 25, 131 N.M. 272, 34 P.3d 1148; *see also
State v. Garcia*, 2005-NMSC-017, ¶ 27, 138 N.M. 1, 116 P.3d 72 (concluding that "the trial
court is in a better position to judge the credibility of witnesses and resolve questions of
fact"). Based on its review, the district court found that Jim Boyles had contempt for Mike
Skeen, that the Boyles had been planning on shutting off the Skeens' water supply at Dry
Pasture Well, that Jim Boyles lied about having called for service on the well, and that the
Boyles had intentionally misled their well expert by having him analyze the wrong well.
Despite these findings, the Boyles argue that some of their actions actually constituted a
showing of good faith. However, they do not demonstrate how this renders the court's
ultimate conclusions that they acted willfully and wantonly, contrary to logic and reason.

**{38}**　Finally, the Boyles challenge the ultimate finding that they misled their well expert.
In support of this challenge, they argue that the well Mr. Wheeler examined had
characteristics in common with the Dry Pasture Well, including a three inch pipe and a cave-
in. The district court was made aware of this fact, but made its determination based on the
depth and water level inconsistencies. Given that record evidence supports the findings of
the court, we must again defer to its resolution of these factual issues. *Id.* Absent a more
significant challenge, we cannot conclude that the court abused its discretion by awarding
punitive damages. Accordingly, we affirm the award.

**Attorney Fees**

**{39}** The district court awarded attorney fees in favor of the Skeens in the full amount they requested, $81,626.53. The award was based on the Skeens' "unopposed" motion arguing that attorney fees were justified because the Boyles engaged in "bad faith" litigation. The Skeens filed their motion on July 30, 2007, and it was received in the Boyles' attorney's office on the third of August. The record is unclear as to whether the attorney knew the motion arrived that day. The applicable rule required a response to the motion within fifteen days. No response was filed until September 4, 2007, accompanied by a request for an extension of time. The Boyles' attorney explained that he was gone for a three-week vacation when the notice arrived at his office and that the motion had been misfiled by his secretary. The district court denied the request for an extension of time, determining that it was not justified by excusable neglect. In so ruling, the district court highlighted the fact that the Boyles' notice of appeal bearing their attorney's signature was filed within the fifteen day period, when the attorney asserted he was on vacation.

**{40}** The district court based its decision to deny the Boyles an opportunity to respond on Rule 1-007.1(D) NMRA (2000, as amended through 2005), which stated in relevant part, "[u]nless otherwise specifically provided in these rules, any written response . . . shall be filed within fifteen (15) days after service of the motion. Failure to file a response within the prescribed time period constitutes consent to grant the motion, . . . and the court may enter an appropriate order."[1] "Rule 1-007.1(D) applies to all motions." *Lujan v. City of Albuquerque*, 2003-NMCA-104, ¶ 15, 134 N.M. 207, 75 P.3d 423. The district court denied the request for an extension of time to respond pursuant to Rule 1-006(B)(2) NMRA which states in relevant part, "[w]hen by these rules . . . an act is required . . . to be done at or within a specified time, the court for cause shown may, at any time in its discretion . . . permit the act to be done where the failure to act was the result of excusable neglect."

**{41}** The Boyles challenge the award of attorney fees on several grounds. They argue: (1) that their due process rights were violated by the district court's refusal to allow them to respond to the merits of the attorney fees issue; (2) that the district court erred in finding that their tardy response was not justified by excusable neglect; (3) that the "bad faith" exception does not apply here because they did not engage in any frivolous or vexatious conduct during the course of litigation; and, finally, (4) that the amount awarded is unreasonably excessive because all of the Skeens' attorney fees were awarded, instead of just those resulting from any alleged bad faith. The Skeens' reply is straightforward; the district court acted within its discretion and should be affirmed. Our resolution of the Boyles' second point is dispositive and we need not discuss the others.

**{42}** We generally apply an abuse of discretion standard to determine whether the district court erred in denying the extension of time based on an absence of excusable neglect. *H-B-S P'ship v. Aircoa Hospitality Servs., Inc.*, 2008-NMCA-013, ¶ 22, 143 N.M. 404, 176 P.3d 1136 (filed 2007); *see also Capco Acquisub, Inc. v. Greka Energy Corp.*, 2007-NMCA-011, ¶ 25, 140 N.M. 920, 149 P.3d 1017 (filed 2006) (applying an abuse of discretion standard of review where an extension of time was denied based on an absence of excusable neglect).

---

[1]Rule 1.007.1(D) has been subsequently amended to remove the language that failure to respond constitutes consent. We apply the version in place at the time of trial.

**{43}** The nature of our review is affected by the nature of the order entered by the district court. Our review is more exacting when the order being reviewed grants some sort of final relief without consideration of the merits of a claim or defense. Thus, for example, in *Lujan*, we reversed a grant of summary judgment in favor of the city premised on the plaintiff's failure to respond to the motion within the fifteen day limit set by Rule 1-007.1(D). *Lujan*, 2003-NMCA-104, ¶ 12. The language of Rule 1-007.1(D) notwithstanding, we held that dismissal with prejudice was inappropriate.

**{44}** *Lujan* made clear that "[b]efore ordering dismissal with prejudice on a motion for summary judgment for failure to respond, a district court should consider: (1) the degree of actual prejudice to the [opposing party], (2) the amount of interference with the judicial process, and (3) the culpability of the litigant." (Alteration in original) (internal quotation marks and citation omitted). Because the district court failed to undertake this analysis, this Court reversed under an abuse of discretion standard. 2003-NMCA-104, ¶¶ 8, 12.

**{45}** *Lujan* held that given the circumstances of the case—actively litigated for three years and ready for trial in a little over a month after the dismissal—dismissal could not be supported when there was no egregious conduct and no discernible prejudice to the defendant. *Id.* ¶ 13. The analysis in *Lujan* was driven by our system's strong bias toward deciding cases on their merits, thus relegating dismissal to only the most severe cases. *Id.* ¶ 11.

**{46}** On the other end of the spectrum are cases involving the grant of default judgment. Our cases make clear that granting a default judgment or a motion to set aside a default judgment rests within the sound discretion of the district court. *Gandara v. Gandara*, 2003-NMCA-036, ¶ 9, 133 N.M. 329, 62 P.3d 1211. Just as clearly, however, default judgments are disfavored and "[a]ny doubts about whether relief should be granted are resolved in favor of the defaulting defendant" and, "in the absence of a showing of prejudice to the plaintiff, causes should be tried upon the merits." *Dyer v. Pacheco*, 98 N.M. 670, 673, 651 P.2d 1314, 1317 (Ct. App. 1982) (internal quotation marks and citation omitted).

**{47}** We glean from *Lujan* a marked reluctance to apply Rule 1.007.1(D) strictly—in the absence of other factors—if doing so results in the loss of a trial on the merits of a case. This reluctance dovetails well with our general concern about granting relief by default; that is without a trial on the merits. In this case, the effect of the trial court's refusal to allow a late response to the motion for attorney fees was to grant a default judgment. Analogizing to *Lujan*, the district court applied Rule 1-007.1(D) strictly and granted relief, resulting in the loss of a hearing on the merits of the motion.

**{48}** We emphasize that the motion sought new and relatively rare monetary relief from the Boyles, attorney fees as a sanction for bad faith litigation. The motion constituted in effect a new claim against the Boyles. There is no indication from the record that the Boyles expected or should have expected the request.

**{49}** The record of the hearing does not reflect any consideration by the district court of any prejudice to the Skeens or of any potential interference with the judicial process flowing

from the Boyles' failure to comply with Rule 1-007.1(D). In this context we find an abuse of discretion in that the district court did not apply the correct legal standard to the issue. *N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 7, 127 N.M. 654, 986 P.2d 450 (holding that an abuse of discretion may be found if a discretionary decision is premised on a misapprehension of the law).

**CONCLUSION**

**{50}** We affirm all holdings of the district court in the main appeal. We reverse the attorney fee award and remand for further consideration of its merits.

**{51}  IT IS SO ORDERED.**

_____
**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____
**RODERICK T. KENNEDY, Judge**

_____
**MICHAEL E. VIGIL, Judge**

**Topic Index for *Skeen v. Boyles*, No. 27,910**

| | |
|---|---|
| **CN** | **CONTRACTS** |
| | |
| CN-AF | Attorney Fees |
| CN-BR | Breach |
| | |
| **PR** | **PROPERTY** |
| PR-ES | Easement |
| | |
| **RE** | **REMEDIES** |
| RE-CD | Compensatory Damages |
| RE-MI | Mitigation of Damages |
| RE-PU | Punitive Damages |
| | |
| **CP** | **CIVIL PROCEDURE** |
| CP-AO | Abusive or Oppressive Conduct |
| CP-EN | Excusable Neglect |
| CP-TL | Time Limitations |