This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**FIDENCIO (LENCHO) VILLALOBOS,**

    Plaintiff-Appellee,

v.                                                                              **No. 32,973**

**NICHOLAS (NICK) VILLALOBOS, and**
**VILLALOBOS CONSTRUCTION CO., INC.,**

    Defendants-Appellants.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**James T. Martin, District Judge**

Holt Mynatt Martinez P.C.
Matthew P. Holt
Las Cruces, NM

Corbin Hildebrandt
Albuquerque, NM

for Appellee

Joseph Cervantes
Las Cruces, NM

Winchester Law Firm
Michael Winchester
Las Cruces, NM

for Appellants

**MEMORANDUM OPINION**

**VANZI, Judge.**

**{1}** Fidencio (Lencho) and Nicholas (Nick) Villalobos were shareholders in Villalobos Construction Co., Inc. (the Corporation). Family hostility between the brothers led Lencho to file suit against Nick and the Corporation seeking damages and an accounting. The lawsuit also sought dissolution of the Corporation pursuant to NMSA 1978, Section 53-16-16 (1967). The district court dismissed Lencho's claims for an accounting and damages. However, the court found that it was authorized to act pursuant to Section 53-16-16 to liquidate the assets and business of the Corporation. Concluding that the remedy of dissolution was too drastic, the court invoked its equitable jurisdiction and instead ordered the Corporation to purchase Lencho's shares of stock.

**{2}** Nick and the Corporation filed a timely appeal and raise several issues which we reorganize as follows: (1) whether there is substantial evidence to support the district court's finding of oppressive conduct under Section 53-16-16; (2) whether the district court erred in exercising its equitable jurisdiction under Section 53-16-16 rather than enforcing a Buy-Sell Agreement among the shareholders and the Corporation; and (3) whether the court erred in its valuation of Lencho's stock interest

and in awarding prejudgment interest on the entire amount of the Judgment. We reverse the court's award of prejudgment interest and affirm on all other issues.

**BACKGROUND**

**{3}** Nick Villalobos Construction Co., Inc., was incorporated in 2001 with Nick as its sole owner and shareholder. Its primary business was to bid on, and perform, highway bridge and road construction throughout New Mexico. In 2007, Nick and Lencho discussed going into business together and, in February 2008 Nick formally offered Lencho a fifty percent (50%) interest in the Company. That same month, the Company adopted certain resolutions, including offering 1,000 shares of common stock to Lencho and resolving to change its name to Villalobos Construction Co., Inc. (the Corporation). Both the February 2008 resolutions and written offer of stock required all of the shareholders of the new corporation to enter into a Buy-Sell Agreement.

**{4}** On March 18, 2008, Lencho formally accepted the offer to purchase 1,000 shares of stock for $1.00 per share, reflecting a 50% ownership of the Corporation. On the same day, Lencho and Nick signed an agreement with respect to issuance of common stock in the company, as well as the Buy-Sell Agreement, individually and in their representative capacities on behalf of the Corporation. The brothers' respective spouses were part of, and also signed, the corporate documents and Buy-

Sell Agreement. The brothers believed that the Corporation would need about $500,000 in startup money, and they agreed that each would contribute $250,000 to the venture. Nick had previously deposited $252,632.22 into the Corporation's bank account and so Lencho wrote a check for—and deposited—the same amount.

{5} The impetus for organizing the new entity arose out of the brothers' desire to bid on a highway bridge construction project near Mora, New Mexico (the Mora Project). The Corporation was awarded the Mora Project in February 2008 and sometime in March or April construction on the project began. Papers filed with the State establish that Lencho was assigned as the superintendent and Nick as project manager.

{6} Almost immediately, there was discord between Nick and Lencho. The two were unable to agree on virtually anything, including the material terms and conditions for the management of the operations or even on their respective roles in the Corporation. Their disagreements and mutual animosity eventually culminated in an August 2008 exchange of correspondence concerning the possible termination of the business relationship. Nick initiated the process stating that he wanted to buy out Lencho's interest in the Corporation "at a price and purchase terms fair to both parties[.]" For reasons that are unclear, no buy out took place and, in October 2008 Lencho formed his own construction company which began to bid and contract for

4

highway construction work. At that time, all communications between Nick and Lencho ceased.

{7} In May 2010 Lencho filed suit against Nick and the Corporation in the Third Judicial District Court seeking an action for damages and an accounting, as well as for dissolution of the Corporation. In his answer, Nick alleged that he and his wife were the sole officers of the Corporation and disputed that Lencho was ever a shareholder. The district court bifurcated the proceedings and, at the close of the first trial, held that Lencho was and remained an "equal 50%" shareholder in the Corporation. That ruling was not appealed.

{8} The second phase of the trial was tried in three days, including two days in August and a third in December 2012. The district court granted a directed verdict on Count I of the amended complaint finding that the relief for an accounting was moot because the financial records had been produced by the Corporation's bookkeeper and accountant. Further, the court found that the relief sought in Count I for damages based on misappropriation of corporate assets was without evidentiary support. The district court's dismissal with prejudice of Count I is also not part of this appeal.

{9} The matter then proceeded to trial on Count II of the amended complaint—the petition for dissolution of the Corporation pursuant to Section 53-16-16. After the close of evidence, the district court entered its findings of fact and conclusions of law.

Ultimately, the court invoked its equitable jurisdiction and ordered that "the complaint shall be amended so as to ask for the forced sale of corporate assets to reimburse Lencho Villalobos for his 50% share of the corporation." The court found that the book value of the Corporation was $1,198,165 and that the Corporation therefore owed Lencho $599,082.50 plus interest at the rate of 9.375% per annum from February, 22, 2008, the date he first invested in the Corporation, until December 28, 2012. We discuss the grounds of the district court's decision more fully below.

**DISCUSSION**

**Standard of Review**

{10}	In reviewing a judgment entered after a bench trial, we review the district court's application of the law to facts de novo while reviewing the district court's findings of fact for substantial evidence. *Skeen v. Boyles*, 2009-NMCA-080, ¶ 17, 146 N.M. 627, 213 P.3d 531. In reviewing facts found by the district court, we consider whether substantial evidence supports the result reached, not whether there is substantial evidence to support the opposite result. *Id.* "Substantial evidence is relevant evidence that a reasonable mind would find adequate to support a conclusion." *Sitterly v. Matthews*, 2000-NMCA-037, ¶ 22, 129 N.M. 134, 2 P.3d 871.

**The District Court's Jurisdiction to Liquidate the Assets and Business of the Corporation Pursuant to Section 53-16-16**

6

{11}     Section 53-16-16 provides a procedure whereby a district court may order the dissolution of a corporation. In relevant part, Section 53-16-16(A)(1) provides:

> A. The district courts may liquidate the assets and business of a corporation:
>
> (1) in an action by a shareholder when it is established that:
>
> (a) the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock. . . .; or
>
> (b) the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent; or
>
> (c) the shareholders are deadlocked in voting power, and have failed, for a period which includes at least two consecutive annual meeting dates, to elect successors to directors . . . .; or
>
> (d) the corporate assets are being misapplied or wasted[.]

{12}     Lencho's complaint sought dissolution of the Corporation under all of the above provisions. After trial, the district court found that Nick "froze" Lencho out of important decisions concerning the Corporation, did not keep him advised of corporate activities, and prohibited Lencho from "participating in corporate affairs." Further, the district court found that the continued co-ownership of the Corporation by the two brothers was impractical. The district court noted that it could liquidate the assets and business of the Corporation pursuant to its authority under Section 53-16-16. However, relying on *McCauley v. Tom McCauley & Son, Inc.*, 1986-NMCA-065, 104 N.M. 523, 724 P.2d 232, it instead exercised its equitable jurisdiction and

7

required the Corporation to purchase Lencho's shares for one-half of the book value of the company.

{13} On appeal, Nick argues that the district court erred in allowing this matter to proceed on a theory of dissolution under Section 53-16-16 and that the court's reliance on *McCauley* was also erroneous. He first argues that, assuming the statute applies, the district court erred in exercising its equitable discretion under Section 53-16-16 because there was not substantial evidence of any oppressive conduct by a majority shareholder as to a minority shareholder. Second, Nick contends that Section 53-16-16 does not apply in this case because Lencho was contractually bound by the Buy-Sell Agreement and its terms establishing a valuation formula for the stock as well as the rate of interest. Indeed, the application of the Buy-Sell Agreement is the primary focus of Nick's argument on appeal much as it was throughout the proceedings below. Although the district court's findings and conclusions are not a model of clarity, Nick misinterprets the court's rulings with respect to the statutory issue. We conclude that the Buy-Sell Agreement was not triggered and does not control the parties' claims in the circumstances of this case.

{14} With regard to Nick's first argument—that there was not substantial evidence of his oppressive conduct—our review of the district court's findings and conclusions make clear that the court never made any finding of minority shareholder oppression

either as a general matter, or specifically under either Section 53-16-16(A)(1)(b) or *McCauley*. In fact, the district court never stated which provision of Section 53-16-16 it was relying on to dissolve the Corporation, finding only generally that "the circumstances described in Section 53-16-16 . . . are present here[.]" We assume those "circumstances" to encompass any of the statutory provisions authorizing a court to dissolve a corporation including when the directors are deadlocked in the management of the corporate affairs, the acts of the directors are illegal, oppressive or fraudulent, when the shareholders are deadlocked in voting power, or when the corporate assets are being misapplied or wasted. *See* § 53-16-16(A)(1)(a)-(d). And, although *McCauley* dealt with oppressive conduct by majority shareholders against the plaintiff, contrary to Nick's assertions, the district court here did not rely on that case to support a finding of oppressive conduct. Rather, the court relied on *McCauley* for the general proposition that in appropriate circumstances, a district court may exercise its equitable jurisdiction to fashion a remedy less extreme than requiring that a corporation's assets be wholly dissolved. *See McCauley*, 1986-NMCA-065, ¶ 15 (noting that "[a]n order of corporate dissolution is a drastic remedy and should be utilized sparingly, after consideration of other alternative forms of relief").

{15}     We have carefully examined the record and find that there was substantial evidence to support the district court's broad factual finding with respect to the

application of at least two of Section 53-16-16's provisions. Specifically, there was substantial trial testimony that the directors were deadlocked in the management of the corporate affairs and that the shareholders were unable to break the deadlock since Nick and Lencho each held 50% of the shares. Further, Nick and Lencho were deadlocked in voting power and never held a meeting of the shareholders or of the board of directors from March 2008 until at least February 2013. Consequently, at least two provisions of Section 53-16-16 authorized the district court in this case to dissolve the Corporation.

{16}     The district court enigmatically found that the Buy-Sell Agreement was "applicable in general" but then refused to apply it because it would result in an unconscionably low value for Lencho's half of the Corporation. We conclude that the district court's finding as to applicability is not supported by substantial evidence. We explain.

{17}     Generally, a buy-sell agreement is a contract by which the stockholders of a closely held corporation seek to maintain control over the ownership and management of their business by restricting the transfer of its shares. *See Black's Law Dictionary* 242 (10th ed. 2014) (defining a "buy-sell agreement" as "[a] share-transfer restriction that commits the shareholder to sell, and the corporation or other shareholders to buy, the shareholder's shares at a fixed price when a specified event occurs"). The typical

agreement provides for the mandatory or optional repurchase of a stockholder's shares by the corporation or by the other stockholders upon the occurrence of a certain event. *Id.* Here, the Buy-Sell Agreement provided that its provisions were triggered by a stockholder's death, disability, termination of marriage by death or divorce, an involuntary disposition such as a declaration of bankruptcy, or termination of employment. Nick contends that the triggering event was the termination of Lencho's employment relationship with the Corporation. We disagree.

{18}     First, Nick points to nothing in the record or the district court's findings and conclusions establishing that either he or Lencho had an employment relationship with the Corporation. *See Black's Law Dictionary* 641 (10th ed. 2014) (defining "employment" as "[t]he quality, state, or condition of being employed; the condition of having a paying job" or "[w]ork for which one has been hired and is being paid by an employer"). Here, there is no employment contract, no showing that Nick or Lencho were hired to work for the Corporation, and testimony from both brothers that neither took a salary. The sole basis for Nick's assertion that Lencho was an employee is that, after October 2008, Lencho abandoned the Mora Project and any role in future construction projects; he "did not exercise or attempt to exercise any continuing role in the management, finances, or labors" of the Corporation; he did not receive or

request any meeting notices, corporate records or financial information; nor did he make any attempt to communicate with Nick.

{19}    The record is replete with indications that Nick himself did not believe that the Buy-Sell Agreement applied to the situation the brothers found themselves in. For instance, Nick admits that in August 2008, he "initiated a process to buy out [Lencho's] interest, if any, in the [Corporation]" and that he sought "to arrive at a price and purchase terms fair to both parties[.]" In that regard, he asked Kristi Micander, the CPA for the Corporation, to provide him with the method by which she intended to "value [Lencho's] interest in the [C]orporation and the basis for that opinion." Micander testified that she understood that the termination of the brothers' relationship was "going to occur by way of voluntary purchase of [Lencho's] interest in the [C]orporation." Yet Nick himself never attempted to invoke the terms of the Buy-Sell Agreement even though in the course of the litigation he has steadfastly maintained that Lencho voluntarily terminated his employment in the late summer and early fall of 2008. Nick's own disregard of any contractual commitment contained in the Buy-Sell Agreement with regard to the purchase price of the stock suggests he did not contemplate its application to the termination of the brothers' business relationship.

{20}    Even assuming that Lencho terminated his employment with the Corporation, the Agreement provides that the sale/purchase of stock "*shall* be not later than ninety (90) days" following the shareholder's termination of employment. (Emphasis added.) Thus, in order to seek relief under the Buy-Sell Agreement, the sale of Lencho's shares and purchase of those shares by the Corporation should have taken place by the end of January 2009 at the very latest. It did not. Nick and the Corporation's failure to act in accordance with this mandatory term is a persuasive circumstance supporting the conclusion that from the parties' point of view the Buy-Sell Agreement was not triggered and does not apply.

{21}    Finally, we note that the Buy-Sell Agreement provides that if "any controversy or claim arising out of this Agreement cannot be settled by the parties, the controversy or claim *will be* settled by Arbitration." (Emphasis added.) This provision is clear beyond dispute—the Buy-Sell Agreement requires arbitration of all disputes between Nick and Lencho arising under it, including the valuation provision triggered by the relevant event. *See, e.g.*, *Thriftway Mktg. Corp. v. State*, 1992-NMCA-092, ¶ 8, 114 N.M. 578, 844 P.2d 828 (stating that under the rules of statutory construction, the words "shall" and "will" are mandatory and "may" is permissive or directory). Nick never invoked the arbitration provision when the troubles between him and Lencho arose, and he never asked the district court to compel arbitration once the litigation

was filed. In our view, the fact that Nick did not initiate a buy out under the Agreement once he believed that Lencho had terminated his employment, coupled with the Agreement's mandatory sale/purchase within ninety days following the termination, and the mandatory arbitration provision all support the conclusion that the Buy-Sell Agreement does not apply to this dissolution action.

{22}    In reaching our result, we have not lost sight of the fact that shareholder agreements are normally enforceable as a matter of contract, and we recognize that one generally may not seek a dissolution of a corporation to avoid the consequences of a buy-sell agreement. However, we conclude that under the circumstances of this case, the Buy-Sell Agreement does not apply and Lencho could properly seek redress through a dissolution proceeding requiring an accounting. We consider next the question of the district court's valuation method including the award of prejudgment interest.

**The Valuation of the Stock and the Interest Assessed**

{23}    Nick argues that the district court erred in its valuation of stock and corresponding award of prejudgment interest. The district court rejected the valuation formula in the Buy-Sell agreement, as well as the valuations calculated by the two accounting experts, and instead assessed the book value of the Corporation at $1,198,165. Nick makes absolutely no argument on appeal as to how or why the

14

district court erred in its valuation method and we therefore do not address whether the evidence was sufficient to support the court's findings and conclusions on this issue. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 ("We will not review unclear arguments, or guess at what [a party's] arguments might be.")

**{24}** With respect to the prejudgment interest rate, the district court found that based on the book value, the Corporation owed Lencho $599,082.50 plus interest at the rate of 9.375% per annum from February, 22, 2008, the date he first invested in the Corporation, until December 28, 2012. This rate of interest, according to the court, reflected "Lencho's actual cost of his investment, plus the prime rate of interest." The total award of $924,955.98 continued to accrue post-judgment interest at a rate of 8.75% per annum, until paid. We agree with Nick that the district court's imposition of a 9.375% prejudgment interest rate beginning in February 2008 for the entire amount of the judgment—a total of $325,873.48—was error.

**{25}** Awarding prejudgment interest is left to the sound discretion of the district court. *See Abeita v. N. Rio Arriba Elec. Coop.*, 1997-NMCA-097, ¶ 44, 124 N.M. 97, 946 P.2d 1108. We will reverse a district court's failure to award prejudgment interest only upon an abuse of that discretion. *Martinez v. Pojoaque Gaming, Inc.*, 2011-

NMCA-103, ¶ 20, 150 N.M. 629, 264 P.3d 725. A district court does not abuse its discretion if its reasons are supported by logic and not contrary to reason. *Id.* ¶ 21.

**{26}** Prejudgment interest is governed by statute. NMSA 1978, § 56-8-4(B) (2004) provides that:

> [u]less the judgment is based on unpaid child support, the court in its discretion may allow interest of up to ten percent from the date the complaint is served upon the defendant after considering, among other things:
>
> (1) if the plaintiff was the cause of unreasonable delay in the adjudication of the plaintiff's claims; and
>
> (2) if the defendant had previously made a reasonable and timely offer of settlement to the plaintiff.

Section 56-8-4(B) is designed to facilitate settlement and prevent delay. *Lucero v. Aladdin Beauty Colls. Inc.*, 1994-NMSC-022, ¶ 10, 117 N.M. 269, 871 P.2d 365. Additionally, the "two factors listed in Section 56-8-4(B) are not exclusive; the [district] court should take into account all relevant equitable considerations that further the goals of Section 56-8-4(B)." *Gonzales v. Surgidev Corp.*, 1995-NMSC-036, ¶ 59, 120 N.M. 133, 899 P.2d 576.

**{27}** In this case, the district court's award of prejudgment interest at the 9.375% has no support in the record. And it fails in several respects. First, there is no dispute that Lencho made a $252,000 capital investment in the Corporation in February 2008. The district court valued Lencho's stock interest in the Corporation as of December 31,

2008. Yet the court computed the prejudgment interest on the December 31, 2008, valuation going back ten months to February 2008. At the very least, the district court improperly duplicated the recovery to Lencho and prejudgment interest—to the extent it was recoverable—could only be applied to the $252,000 capital contribution made in February 2008.

**{28}** Second, and more importantly, the district court made no findings explaining why prejudgment interest was recoverable in this case. It made no finding that Nick made unreasonable and untimely settlement offers or that he unduly delayed resolution of the case. Further, the court did not find that prejudgment interest would serve the interests of justice. Consequently, we conclude that the district court abused its discretion in awarding prejudgment interest in the amount of $325,873.48 and reverse the district court on this issue.

**CONCLUSION**

**{29}** For the foregoing reasons, we reverse the district court's award of prejudgment interest and affirm on all other issues.

**{30}** **IT IS SO ORDERED.**

_____

**LINDA M. VANZI, Judge**

17

**WE CONCUR:**

_____

**MICHAEL D. BUSTAMANTE, Judge**

_____

**J. MILES HANISEE, Judge**